06-2882-cr
United States v. Fell

D. Vt.
Sessions, J.
01-cr-12

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: June 27, 2007                                    Decided: June 27, 2008)

Docket No.  06-2882-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

— v .—

DONALD FELL

*Defendant-Appellant*.

_____

Before:          WALKER, CABRANES, and B.D. PARKER, *Circuit Judges*.

_____

Donald Fell appeals from a judgment of the United States District Court for the District of Vermont (Sessions, *C.J.*).  He was convicted of carjacking and kidnapping with death resulting and was sentenced to death.  AFFIRMED.

_____

JOHN BLUME, Cornell Law School, (Christopher Seeds, Sheri Lynn Johnson, *on the brief*), Ithaca, NY; Alexander Bunin, Federal Public Defender, Albany, NY, *for Defendant-Appellant*.

WILLIAM B. DARROW, Assistant United States Attorney (Thomas D. Anderson, United States Attorney for the District of Vermont; Paul J. Van de Graaf, Gregory L. Waples, Assistant United States Attorneys, *on the brief*), Burlington, VT; Thomas Booth, United States Department of Justice, Washington, D.C., *for Appellee.*

_____

BARRINGTON D. PARKER, *Circuit Judge*:

Donald Fell was convicted of murdering Teresca King in the course of a carjacking and kidnapping. Following a hearing on possible penalties and a verdict rendered by the jury, he was sentenced to death by the United States District Court for the District of Vermont (Sessions, *J.*). In this appeal, Fell challenges his sentence on a number of grounds falling roughly into four categories: errors in jury selection, errors in the admission of certain evidence, prejudicial comments by the prosecutors, and the violation of certain provisions of the Federal Death Penalty Act (FDPA), 18 U.S.C. § 3591 *et seq*. We affirm.

## BACKGROUND

This case stems from the brutal murders by Fell and his accomplice Robert Lee in November 2000 of Fell's mother Debra, her companion Charles Conway, and King. The facts are largely undisputed. Fell, who was 20 years old at the time of the murders, does not contest his guilt and the government does not contest much of the evidence of the troubled childhood and adolescence that Fell adduced in an effort to avoid the death penalty.

Fell spent his early years in Pennsylvania with parents who were chronic alcoholics. Both Fell and his sister were raped by babysitters when they were young children, abandoned by their

parents, and raised by relatives. Fell had frequent brushes with the law of increasing seriousness and, for a period of time, was committed to a home for delinquent youth. After his release, his involvement with the law continued to escalate and was punctuated by serious drug and alcohol abuse.

Fell's mother moved to Rutland, Vermont in September 2000 and Fell joined her shortly thereafter. Their stormy relationship continued. Fell and his mother (and their friends) drank heavily, argued frequently, and abused drugs. For example, in November 2000, in an incident that was the subject of disputed trial testimony, Fell assaulted his mother in a bar. After taking his mother's drink and attempting to rob her, Fell punched her in the head, knocked her to the ground and was arrested.

On the evening of November 26, 2002, Fell, Lee, Debra Fell, and Charles Conway were playing cards at her residence. All were drinking heavily and some were using drugs. For reasons not reflected in the record, a violent altercation ensued. Fell produced a kitchen knife and stabbed Conway approximately 50 times causing his death,. Lee began stabbing Debra Fell and killed her with multiple wounds to the head and neck. Fell and Lee then showered, stole a shotgun from the house, and left on foot at approximately 3:30 am for a local mall in search of shells for the gun.

Fell and Lee first went to Wal-Mart, but were turned away by a cleaning crew that informed them that the store was closed. Fell and Lee then approached a Price Chopper convenience store, where they found King, a 53 year old grandmother, just arriving for work in her car. Fell and Lee stole her car and forced her into the backseat at gunpoint. King attempted

to escape while on the highway but Fell restrained her. After driving for several hours and entering New York state, Fell told King that she would be released. As they stopped the car to do so, Lee apparently had second thoughts and convinced Fell that they should kill her to prevent her from identifying them. The two forced King out of her car into the adjoining woods where they repeatedly kicked her and Lee struck her around the head and face with a rock. After killing her, Fell wiped his boots on her clothing. The two proceeded to Pennsylvania where they stole license plates, placed them on King's car, and drove to Arkansas where they were arrested on November 30th. Following questioning by the Arkansas police and the FBI, Fell, verbally and in a written statement, confessed to the murder of Conway, described Debra Fell's murder, and confessed to the murder of King. On December 2, he made a tape-recorded confession for Vermont police, who had flown to Arkansas.

Subsequently, Fell and Lee were indicted. The four counts of the indictment charged them with (1) carjacking Teresca King with death resulting; (2) kidnapping and transporting Teresca King in interstate commerce with death resulting; (3) possession of a firearm in furtherance of a crime of violence; and (4) transporting a firearm in interstate commerce by fugitives. *See* 18 U.S.C. §§ 2119(2) & (3); 1201(a)(1) & (2); 924(c)(1)(A)(ii) & (2); 922(g)(2). Counts 1 and 2 were capital offenses. Before he could be tried, Lee died in prison in the fall of 2001 by his own hand in an accidental hanging.

In October 2001, after extensive negotiations with the United States Attorney's Office of Vermont, Fell signed a draft plea agreement that would have resolved the capital charges with a sentence of life without parole. The draft agreement stated that the government agreed to forego

the capital charges "due to substantial mitigating evidence that has been uncovered related to the defendant's mental health and impaired capacity at the time of the events; his mental health history and background; his assistance to authorities in locating Teresca King's body; the fact that he was 20 years old when he murdered Teresca King and the fact that he does not have a substantial prior criminal history."

The draft agreement also provided that "this agreement will not become effective until approved by the Attorney General of the United States or his delegate, and until thereafter signed by the United States Attorney for the District of Vermont." The draft was signed by Fell and his counsel, but was rejected by the Attorney General upon the advice of the standing committee of the Department of Justice that reviews death-eligible prosecutions. *Cf. United States v. Sampson*, 486 F.3d 13, 24 & n.3 (1st Cir. 2007) (describing these procedures); *United States v. Wilk*, 452 F.3d 1208, 1211 n.2 (11th Cir. 2006). The United States Attorney then agreed that, with the consent of the District Court, Fell would plead guilty in exchange for a bench trial on sentencing. The Attorney General rejected this agreement as well.

In January 2002, the government filed a Notice of Intent to Seek the Death Penalty. *See* 18 U.S.C. § 3593(a). The notice stated that the government intended to prove four threshold culpability factors,[1] *id.* § 3591(a), three statutory aggravating factors, *id.* § 3592(c),[2] and four

_____

[1] The threshold culpability factors were that Fell: (1) intentionally killed Teresca King; (2) intentionally inflicted serious bodily injury that resulted in the death of Teresca King; (3) intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts; and (4) intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and

non-statutory aggravating factors, *id*. § 3593(a).[3] After the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), called into question the validity of indictments in which the government did not charge statutory aggravating factors, the government obtained a superseding indictment which included the threshold culpability factors and the statutory aggravating factors.

Fell, represented by the Federal Defender Service, moved to dismiss the indictment on a number of grounds. He contended that the FDPA was unconstitutional because it permitted imposition of the death penalty on the basis of evidence that had not been tested according to the Sixth Amendment's guarantee of confrontation or the Fifth Amendment's guarantee of due process, or that would have been deemed inadmissible under the Federal Rules of Evidence. *Id.* at 489. The district court granted the motion. *See United States v. Fell*, 217 F. Supp. 2d 469, 491 (D. Vt. 2002).[4]

---

Teresca King died as a direct result of such act or acts. *See* 18 U.S.C. § 3591(a)(2)(A)-(D).

[2] The statutory aggravating factors were: (1) "The death of Teresca King occurred during the commission of a kidnapping"; (2) "Donald Fell committed the offense in an especially heinous, cruel, or depraved manner in that it involved serious physical abuse to Teresca King"; and (3) "Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode." *See* 18 U.S.C. §§ 3592(c)(1), (6) & (16).

[3] The non-statutory aggravating factors were: (1) "Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder"; (2) "Donald Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking"; (3) "Donald Fell participated in the murder of King after substantial premeditation to commit the crime of carjacking"; and (4) "As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the Defendant caused loss, injury and harm to the victim and the victim's family, including but not limited to the following: a) Infliction of distress on the victim. . . . . b) Impact of the offense on the family of the victim . . . ." *See* 18 U.S.C. § 3593(a).

[4] The painstaking work of Chief Judge Sessions generated a number of published opinions. *United States v. Fell*, 217 F. Supp. 2d 469 (D. Vt. 2002), *rev'd United States v. Fell*,

The government appealed and we reversed. *See United States v. Fell*, 360 F.3d 135 (2d Cir. 2004) ("*Fell I*"), *cert. denied,* 543 U.S. 946 (2004). We held that the Constitution did not require adherence to the Federal Rules of Evidence. We also found the FDPA's evidentiary provisions constitutional because they were consistent with the heightened reliability standards required in capital trials. *Fell*, 360 F.3d at 143-44. On remand, the district court rejected Fell's remaining constitutional challenges. *See Fell*, 372 F. Supp. 2d at 755 (D. Vt. 2005).

Jury selection began on May 4, 2005 and was completed on June 6. The guilt phase began on June 20 and ended on June 24. The government presented eighteen witnesses; the defense presented no evidence. The jury was charged on June 24 and, later that day, found Fell guilty on all counts.

The penalty phase commenced on June 28. The government offered evidence from seven witnesses, including five victim impact witnesses, who attested to the devastating effects of King's murder on her family and friends. The defense introduced testimony from fourteen witnesses, including Fell's family members, teachers, social service providers, and correctional institution officials. These witnesses testified regarding Fell's troubled childhood, his personal characteristics, the familial violence he witnessed and experienced, his early drug and alcohol abuse, and his adaptation to prison. The government then presented five rebuttal witnesses – – three prison officials, one of Fell's former teachers, and a former friend – – to dispute this picture.

---

360 F.3d 135 (2d Cir. 2004); *United States v. Fell*, 372 F. Supp. 2d 753 (D. Vt. 2005); 372 F. Supp. 2d 773 (D. Vt. 2005); and *United States v. Fell*, 372 F. Supp. 2d 766 (D. Vt. 2005); *United States v. Fell*, 372 F. Supp. 2d 786 (D. Vt. 2005).

The jury was charged on July 13. It was instructed to consider whether the prosecution had met its burden of proof as to each of the capital counts and whether Fell had established his mitigating factors by a preponderance of the evidence. To impose the death penalty, the jury was required to find one or more of the threshold eligibility factors, at least one of the statutory aggravating factors, and the existence of any non-statutory aggravating factors. In weighing the relevant aggravating and mitigating factors to determine the appropriate punishment, the jury was instructed to assess both the direct and the circumstantial evidence presented at the guilt and sentencing phases of the trial.

The next day, the jury unanimously found the existence of each of the four threshold factors, the three statutory aggravating factors, and the five non-statutory aggravating factors. The verdict form indicated that seventeen mitigating factors had been found by at least one juror, of which eight were found unanimously. Ten jurors added to the verdict form a mitigating factor that had not been presented to them: "[t]otal life experience, failure of the state of Pennsylvania social and mental health services to effectively intervene in [Fell's] childhood abuse and to treat or address his early antisocial behavior." After considering the court's instructions to weigh the aggravating and mitigating factors, the jury decided unanimously that a death sentence should be imposed.

Fell filed a motion for a judgment of acquittal and a new trial, contending that prosecutorial misconduct at the penalty phase required that his death sentence be changed to one of life imprisonment, or alternatively that he be afforded a new penalty trial. The district court denied these motions on April 24, 2006. *United States v. Fell*, 2006 U.S. Dist. LEXIS 24707 (D.

8

Vt. Apr. 24, 2006). Following a sentencing hearing in which the district court heard statements from the victim and from Fell, it imposed the death penalty consistent with the jury's recommendation.[5] See 18 U.S.C. §§ 3593(e)-3594. This appeal followed.

**DISCUSSION**

Fell raises a number of issues each of which we must consider separately. 18 U.S.C. § 3595.[6] Most of our discussion considers the district court's exclusion of three jurors, its exclusion of the draft plea agreement, the admission of evidence of a religious nature, the government's compliance with the court's instruction regarding mental health experts, and

---

[5] On June 16, 2006, the district court sentenced Fell to death on counts one and two relating to carjacking and kidnapping. On the gun charges, the court sentenced Fell to 120 months' imprisonment on count four, and 84 months' imprisonment on count three, consecutive to count four.

[6] Specifically, Fell argues that: (1) the district court erred in dismissing three prospective jurors and (2) by excluding a draft plea agreement; (3) the government impermissibly argued that Fell's exercise of his right to a jury trial was inconsistent with acceptance of responsibility; (4) the government impermissibly told the jury that it could ignore certain mitigating evidence; (5) the district court's orders and the government's conduct regarding mental health experts in the penalty phase violated the Fifth and Eighth Amendments; (6) the government violated the First, Fifth, and Eighth Amendments through its reliance on Fell's interest in satanism and other religions; (7) the district court erred in admitting a hearsay statement made by Debra Fell; (8) the district court erred in admitting testimony by a former friend of Fell's as proof of premeditation; (9) the cumulative impact of the government's misconduct and the district court's errors violated the constitution and the Federal Death Penalty Act (FDPA); (10) duplicative aggravating factors unconstitutionally skewed the jury's weighing process towards the death penalty ; (11) the government was required to allege the non-statutory aggravating factors in the indictment; and (12) the bifurcated capital trial mandated by the FDPA violates the Fifth and Sixth Amendments. This opinion resolves each of these issues.

9

several allegedly improper arguments made by the prosecution, as well as Fell's challenges to the superseding indictment.[7]

Different standards of review apply to these issues. We review challenges to a juror's excusal for abuse of discretion, inquiring whether the trial court's findings are "fairly supported by the record." *Wainwright v. Witt*, 469 U.S. 412, 434 (1985); *see also United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006). We review a district court's evidentiary rulings for abuse of discretion. *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003). Conclusions of law, including those involving constitutional questions, are reviewed *de novo*. *Ramos v. Town of Vernon*, 353 F.3d 171, 174 (2d Cir. 2003). A defendant's conviction may be vacated if prosecutorial misconduct caused substantial prejudice implicating the right to due process. *United States v. Elias*, 285 F.3d 183, 190-92 (2d Cir. 2002). However, "remarks of the prosecutor in summation do not amount to a denial of due process unless they constitute egregious misconduct." *Id*. at 190 (internal citations omitted).

Nearly all the evidentiary issues Fell raises were not preserved at trial and were presented for the first time either in his motion for a new trial or on appeal. These issues are generally

---

[7] 18 U.S.C. § 3595(c)(1) also requires that a reviewing court consider whether a death sentence was "imposed under the influence of passion, prejudice, or any other arbitrary factor[.]" The record reveals no evidence that any of those factors led to Fell's sentence. Indeed, there is every indication that the jury carefully considered the district court's instructions. Significantly, it *sua sponte* found mitigating factors in addition to those proposed by defense counsel. "Viewed collectively, these findings suggest that the jury considered the evidence in a thorough, even-handed, and dispassionate manner." *United States v. Sampson*, 486 F.3d 13, 52 (1st Cir. 2007). Additionally, we must independently determine that the evidence supported the finding of at least one of the charged statutory aggravating factors under 18 U.S.C. § 3592. 18 U.S.C. § 3595(c)(1). Given that Fell confessed to the crime, we have little trouble concluding that the evidence was sufficient to support the jury's verdict as to the aggravating factors.

10

subject to plain error review.[8] Relief is unavailable unless (1) there was error; (2) it was plain; and (3) it prejudicially affected substantial rights. *See Jones v. United States*, 527 U.S. 373, 389-90 (1999). "Upon concluding that an error occurred which is plain and affects substantial rights . . . an appellate court [must] exercise its discretion to correct such error only 'if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *United States v. Gonzalez*, 110 F.3d 936, 945-46 (2d Cir. 1997) (quoting *United States v. Olano*, 507 U.S. 725, 732-34 (1993)).

## I. Jury Selection

The district court conducted a two-part *voir dire* of potential jurors. Each potential juror was initially required to complete an extensive questionnaire, which included questions about personal history, knowledge of the case, and opinions regarding the death penalty. The veniremen were also asked to locate their opinion on the death penalty on a scale of one to ten, with one being strongly opposed to, and ten being strongly in favor of, the death penalty. At the start of the *voir dire*, the court announced that it would permit counsel to ask prospective jurors questions about their ability to impose the death penalty as suggested by the facts of the case, as long as the primary purpose of the questions was to ensure impartiality. The court prohibited counsel from posing "stake-out" questions that might require a juror to speculate or precommit as to how, given certain facts, that juror would react. *See Fell*, 372 F. Supp. 2d at 770. Each

---

[8] We note that because our review here is for plain error, 18 U.S.C. § 3595(c)(2) does not control our analysis. *Cf. Jones*, 527 U.S. at 388-89 (finding that § 3595(c)(2) does not create an exception to plain error review under the FDPA); 18 U.S.C. § 3595(c)(2) (providing that the government may show that reversal is not required by proving that "legal error . . . that was *properly preserved*" was harmless beyond a reasonable doubt (emphasis added)).

potential juror was then questioned individually, rather than in an array, first by the court, which generally inquired into exposure to pre-trial publicity and views on the death penalty, and then by the parties.

Fell contends that the district court improperly excused three qualified prospective jurors, numbers 64, 141 and 195, in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968) and *Wainwright v. Witt*, 469 U.S. 412, 420-21 (1985). Prospective Juror 64, Fell argues, was excused based on her general disfavor of capital punishment. Prospective Jurors 141 and 195 were, Fell contends, excused for expressing reservations about applying the death penalty under specific factual circumstances not presented by this case, even though they affirmed that they could consider and impose a death sentence if warranted by the evidence.

Under *Witherspoon* and its progeny, "not all [prospective jurors] who oppose the death penalty are subject to removal for cause in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 176 (1986). Instead, "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Id*. In *Witt*, the Supreme Court explained that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." 469 U.S. at 424 (internal quotation marks omitted); *see also Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007). That impairment occurs when those views "create an obstacle" to a prospective juror's impartial consideration of the law and the facts. *Witt*, 469 U.S. at 434.

12

Erroneously excluding a prospective juror based on her view on the death penalty is reversible error, *see Gray v. Mississippi*, 481 U.S. 648, 668 (1987), and we review challenges to a district court's exclusion of a juror on that basis for abuse of discretion. *United States v. Quinones*, 511 F.3d 289, 304 (2d Cir. 2007). To survive our review, "*voir dire* need not establish juror partiality with 'unmistakable clarity.' Rather, it must be sufficient to permit a trial judge to form 'a definite impression that a prospective juror would be unable to faithfully and impartially apply the law.'" *Quinones*, 511 F.3d at 301 (quoting *Witt*, 469 U.S. at 424, 426). As the Supreme Court explained in *Witt*:

> Many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

469 U.S. at 424-26 (footnote omitted). Accordingly, our review affords substantial deference to the judgment of the district court, as "the question [before us] is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." *Id.* at 434.

This deference is particularly warranted in light of a district court's dependence on its direct observations of demeanor and subjective assessments of credibility when conducting jury selection. Demeanor and credibility assessments are "peculiarly within a trial judge's province" and are therefore "entitled to deference . . . on direct review." *Id.* at 428. As the Supreme Court has explained, "[d]eference to the trial court is appropriate because it is in a position to assess the

13

demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." *Uttecht*, 127 S. Ct. at 2224; *see also Quinones*, 511 F.3d at 303. Such deference is due here where the district court noted that it "looked past prospective jurors' literal answers and . . . based rulings on the demeanor of the jurors." *Fell*, 372 F. Supp. 2d at 767.

### 1. Prospective Juror 64

Fell contends that Prospective Juror 64 – – who expressed strong opposition to the death penalty, and indicated that she would have difficulty voting for it regardless of the law – – was improperly excused because she also stated that she could follow the court's instructions and apply the law despite her strong reservations. While the exclusion of this prospective juror presents a closer call than that of the other contested prospective jurors, we conclude that the trial court did not abuse its discretion in excusing her.

On her juror questionnaire, Juror 64 indicated that on a scale of one to ten, with one being strongly opposed to the death penalty and ten being strongly in favor, she was a one. She noted that she was "strongly opposed to the death penalty" and would "lean more generally to having someone be sentenced to life imprisonment without parole than to be sentenced to death." She stated that she would not "say that someone deserved death just because it was premeditated," but could consider a death sentence to be appropriate for individuals who commit "unforgivable type[s] of war crimes" like genocide or mass murder.

14

During *voir dire*, Juror 64 affirmed that while it would be "difficult" for her to vote for a death sentence, she could consider and apply the death penalty "as part of [her] job of being on the jury" if the circumstances warranted. She elaborated:

> Well, I feel like, you know, the courts at this time . . . or at least the way that the law is written, that it does allow for one of the outcomes to be a death sentence. And I guess as part of the process of that being allowed, that I could . . . I could follow that process.

The court then probed into Juror 64's reservations about imposing the death penalty asking whether, despite those views, she could "be fair to the government as well as the defendant . . . [and] impartially consider both options, [the] death penalty and life imprisonment." Juror 64 responded in the affirmative, but qualified her response, somewhat ambiguously, by stating that "[she] never considered being in a position of making that kind of decision" and that she could not "say to [the court] that [she] absolutely and unequivocally do[es] not believe in the death sentence." When pressed further by the court on whether she could impose the death penalty under circumstances where that penalty would be appropriate under the law, she responded equivocally that she "probably could, yes." The government then asked a series of questions, culminating in whether Juror 64 could impose a death sentence if the government carried its burden. She responded: "In theory, I'm very opposed to the death penalty, but it's part of the process of this government, and so I guess if I was sitting as a juror, that – – and that was part of the process, and I had made that decision to do that, then, yes, I could make that decision" but then further explained:

> Well, I am just playing the question over that you asked me in terms of if I could do that, and, you know, again, I would much more lean towards someone being [sentenced to] life

15

without parole, but I think that if . . . I had to make that decision, that I could be able to make that decision, yes.

Defense counsel asked Juror 64 whether she could honestly consider imposing the death penalty, and she responded, "Yes."

Before excusing Juror 64 from the courtroom, the court made a final inquiry:

[D]o you think that, based on your views, you might lean unfairly . . . toward one side or the other? Or do you feel that you could put aside any views . . . [and] be very impartial in your decision about whether the death penalty is appropriate or whether life imprisonment is appropriate?"

In response, she stated, "I guess I would have to say that I would definitely lean more towards life imprisonment than I would towards the death sentence, yes."

After counsel for both sides declined the court's invitation to ask follow-up questions, Juror 64 was excused from the courtroom, and the government then moved to exclude her for cause. The court granted the government's motion, explaining that it could not rely on Juror 64's pledge to follow the court's instructions:

99 percent of the juror[s] would say that they can follow [the instructions of the court]. The question is whether somebody, in light of their own particular views, can be impartial and fair. And, I really wanted an honest response and I think I got an honest response at the very end. . . . I asked whether she could be fair, and her response was, "I would lean toward life imprisonment." . . . I appreciate that she said she could follow instructions but . . . I think my responsibility . . . is to make an analysis of whether somebody really could be fair and impartial. . . . I think that in context, she could not be fair and impartial, and so that's the Court's ruling, and she is excused.

Defense counsel objected to the exclusion.

A prospective juror is not required to affirm that she would favor, or lean toward, the death penalty under any particular circumstances in order to serve. Even "those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases," as long

as they are able to subjugate their own beliefs to the need to follow the court's instructions. *Lockhart v. McCree,* 476 U.S. 162, 176 (1986). Juror 64 averred that she could do just that. Her acknowledgment that imposing a sentence of death would be difficult "did not demonstrate that [she was] unwilling or unable to follow the law or obey [her] oaths," but rather that she may be "more emotionally involved or view [her] task with greater seriousness and gravity." *Adams v. Texas*, 448 U.S. 38, 49 (1980); *see also Witt*, 469 U.S. at 420.

However, the district court's concern that, despite Juror 64's averments to the contrary, she could not be fair and impartial in considering the death penalty is well-grounded in the record. As previously noted, on her questionnaire, she indicated the strongest available opposition to the death penalty. Throughout the district court's painstaking and thoughtful *voir dire*, Juror 64 walked a fine line between her opposition to the death penalty and her willingness to follow the district court's instructions. The record clearly demonstrates that the court endeavored mightily to explore Juror 64's ability to impartially apply the law and afforded both parties ample opportunity to assist in this effort. Nevertheless, at the conclusion of *voir dire*, the court, having the benefit of personally questioning and observing Juror 64, was left to ponder her suitability. While Juror 64 strongly opposed the death penalty and was unprepared to conclude that a defendant deserved death simply because a murder was premeditated, she simultaneously claimed that she could impose the death penalty as part of her responsibilities as a juror in spite of her expressed reluctance to do so.

Under these circumstances, the district court concluded that Juror 64's views might substantially impair her duties as a juror and excused her. This conclusion fell well within the

17

court's broad discretion. *Uttecht*, 127 S. Ct. at 2230; *Witt*, 469 U.S. at 434; *see also Sampson*, 486 F.3d at 41 (A trial court's decision to excuse a prospective juror for cause may be upheld even when the juror "indicated some degree of willingness to put aside personal biases"). As we have recently observed, a "blunt acknowledgment of bias may support removal without further inquiry, [but] the more ambiguous a prospective juror's responses, the more useful demeanor, and thus oral inquiry, become in allowing a trial judge to identify partiality warranting removal for cause." *Quinones*, 511 F.3d at 301-02. Here Juror 64 made no "blunt acknowledgment" of bias but, instead, repeatedly responded to the district court's questioning with ambiguous and qualified answers, thus making her demeanor and oral responses central to the court's qualification inquiry. Based on our review of the *voir dire* transcript, we, like the district court, are left with the "'definite impression'" that Juror 64 "'would be unable to faithfully and impartially apply the law.'" *Id.* at 301 (quoting *Witt*, 469 U.S. at 424, 426).

### 2. Prospective Juror 141

Fell argues that Prospective Juror 141 was improperly excused "because the trial court applied too technical a view of case-specific *voir dire*, ultimately disregarding how Juror 141's views on the death penalty would apply to this case." In his questionnaire, Juror 141 described himself as a four out of ten – – *i.e.*, not strongly opposed or in favor of capital punishment. He indicated that a defendant's state of mind was important in his determination as to whether he would consider the death penalty. In conformity with the court's prior ruling on case-specific questioning, *see Fell*, 372 F. Supp. 2d at 770, the government asked Juror 141 whether he could consider the death penalty in a case that "didn't involve murder, but simply involved someone

18

engaging in violence, knowing that the act created a grave risk of death – – not premeditated murder." Juror 141 responded "no" without qualification or elaboration. The government then asked whether he would consider the death penalty in a case where the defendant committed an act that "constituted a reckless disregard for human life [but] not first degree or premeditated murder." Juror 141 again replied, unequivocally, "No."

Defense counsel objected to the government's line of questioning. In response, the government argued that because reckless disregard for human life under 18 U.S.C. § 3591(a)(2)(D) was alleged in the indictment as a gatekeeping factor, the government had the right to pursue questions related to whether the juror could impose the death penalty absent evidence of intent. Defense counsel then complained that this approach constituted a "stake-out" to determine whether Juror 141 *would* impose the death penalty if Fell were found guilty of reckless disregard for human life rather than whether he *could* impose death in that situation. The district court disagreed, stating that, in conformity with its prior ruling on case-specific questioning, *see Fell*, 372 F. Supp. 2d at 770, the government could ask questions relating to its theory that Fell could be sentenced to the death penalty for conduct demonstrating recklessness. The court noted that defense counsel would have the opportunity to rehabilitate the juror and allowed the government to proceed.

In the course of the government's continued questioning, Juror 141 reiterated that "I just . . . I really feel that the person, in order to be convicted of a death penalty, needs to have known what they were doing, to realize the consequences of what they were doing." Defense counsel then inquired into whether Juror 141 could infer intent from a description of the violence

inflicted and "the resulting damage or injury." Juror 141 indicted that he could. Juror 141 also expressed a willingness to weigh aggravating and mitigating factors, pursuant to the instructions of the court, when considering whether death should be imposed. After this exchange, the district court returned to the issue of whether Juror 141 would consider imposing the death penalty for a killing that was reckless but not intentional, describing the reckless acts as "kicking or stomping." Juror 141 reversed course and claimed that he could consider imposing the death penalty on the basis of such violence, acknowledging that he was "somewhat contradicting [himself]."[9]

---

[9]     Specifically, the following colloquy took place:

THE COURT: If the evidence showed that the defendant did not intentionally kill . . . in other words, did not think about killing . . . but intentionally engaged in an act of violence, knowing that the act created a grave risk of death, and that is, I think the facts, at least the defense is suggesting here, involved kicking or stomping, and that is that there wasn't necessarily an intent to kill, but that it was an intent . . . intentionally acted with a grave risk of death to a person.

JUROR 141: Right.

THE COURT: In that given situation, could you impose the death penalty or not?

JUROR 141: Yes.

THE COURT: Okay. Why? I mean, is that . . . is that a . . . I guess, is my question different than what the government said?

JUROR 141: I . . .no. I realize I am somewhat contradicting myself, but I guess from what . . . what you are saying is that they almost knew what they were doing. They were . . .

THE COURT: Here's the distinction . . . .
     . . . .
Rather than someone intentionally thinking to themselves, I'm going to kill another human being, someone is intentionally deciding to engage in a violent act, recklessly

20

Following a bench conference, the court found, over Fell's objection, that the question of Juror 141's qualification was "so close" that it would not be "fair to proceed with him" and excluded him for cause. The court provided no further reasoning and was not required to do so in light of its discretion in such matters.[10] *See United States v. Mitchell*, 502 F.3d 931, 956 (9th Cir. 2007); *Sampson*, 486 F.3d at 41.

We see no error in the district court's decision to exclude this prospective juror. Juror 141's responses were not consistent or clear on whether he understood that the death penalty could be imposed for murder resulting from reckless disregard for human life and whether he would be able to apply it under such circumstances. A juror's *voir dire* responses that are

---

disregarding the fact that the act caused a grave risk of death to another person. In other words, if you asked that person, did they intend to kill, they would say no, but they are intentionally entering into that violent act.

. . . .

That particular situation, could you impose the death penalty or not?

JUROR 141: Yes.

[10] In response to the government's contention that Juror 141 would not be able to apply the death penalty if it believed that Fell had not intended to kill anyone even if government proved that Fell acted with reckless disregard, defense counsel stated: "Judge, he answered your questions, affirmatively, honestly, [and] thoughtfully, that he could consider a mental state which fit the criteria of a conscious disregard, and he answered you indicating that he could consider that." The court responded that "[it] is true that he did respond that particular way, but it is unclear as to whether he responded in light of my comments about stomping, as opposed to the general theory which now the government is proposing. If the government wants to rely upon that particular theory, and if this juror says that he could not follow that theory and impose a . . . a death sentence, then he is not eligible to serve." Given this colloquy, although the judge did not provide an explanation of his decision to excuse Juror 141 for cause, the record is clear that he believed that the juror would not be willing to follow court's instructions regarding the government's theory that Fell could be eligible for the death penalty if he acted with conscious disregard of the fact that his criminal conduct exposed King to the risk of death.

21

ambiguous or reveal considerable confusion may demonstrate substantial impairment. *Uttecht*, 127 S. Ct. at 2229 ("[A juror's] assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case. . . . "). The district court properly considered all of Juror 141's responses in the context in which they were given and did not err in concluding that his views would significantly interfere with his duties as juror. *See Witt*, 469 U.S. at 434; *Darden,* 477 U.S. at 178. We find no abuse of discretion.

3. Prospective Juror 195

Prospective Juror 195 rated herself as an eight on the ten-point scale of support for the death penalty contained in the juror questionnaire. Despite her support for the death penalty "[a]t a philosophical level," she noted that she was unsure whether she "could vote in favor of it when the decision is in [her] hands." In response to the court's questions about whether she could impose the death penalty if the circumstances warranted, she repeatedly answered "I don't know" or "more yes than no" and gauged her ability to do so as "60/40."

The district court's decision to excuse Juror 195 turned on her inconsistent and generally negative responses when asked whether she would consider imposing the death penalty for a single murder. Juror 195 felt that the death penalty was "not appropriate for every murder" but would be justified "if it was a serial killer or mass murder, say on a mass shooting spree." She also stated that she did not think she would vote in favor of the death penalty "for one killing." The government moved to exclude her for cause following this exchange:

> THE COURT: The question is whether you could follow the instruction and consider the possible death penalty for one . . . if there's only one death.

22

JUROR 195: Probably not. I would probably not be in favor of the death penalty in that scenario.

Under the FDPA, a defendant is eligible for the death penalty if the jury finds the charged homicide, a statutory intent element or threshold mental culpability factor under § 3591(a)(2), and at least one of the statutory aggravating factors in § 3592(c). Although Fell was charged with three statutory aggravating factors – – including committing multiple killings in a single criminal episode under § 3592(c) – – two of the factors related to the death of King. In the event that the jury found that the killings were not part of a single criminal episode, Fell would still be eligible for the death penalty if the jury found at least one of the threshold mental culpability factors and that he had caused King's death during the commission of a kidnapping or that he had committed the offense in an especially cruel or depraved manner. Therefore, the government argued that if Juror 195 could not consider imposing the death penalty without finding that Fell engaged in multiple killings, she would be substantially impaired in her ability to follow the law.

Before ruling, the district court gave defense counsel the opportunity to question Juror 195. In response to defense questioning, she stated that she could consider the death penalty in "any case" and would listen to the facts presented to make that determination. Moments later, when questioned again by the government, Juror 195 retreated to her earlier position that, for the murder "of a single person, [she] would probably say no, I would not be able to choose the death penalty." The court excused Juror 195 based on its assessment that "she would have difficulty following the instructions with regard to the single killing," that she was ambiguous as to whether she could actually vote for the death penalty, and because the court "[could not] feel assured that she would be fair to the government's side."

23

Despite numerous attempts by the court and government to point out that her position disqualified her from jury service, Juror 195 maintained that she would not consider the death penalty for a single killing while still claiming that she could fulfill her duties as a juror and follow the court's instructions. Given Juror 195's inconsistent positions, it is unlikely that she would have followed the court's instructions if empaneled in this case. Accordingly, we conclude that the district court's decision to excuse Juror 195 was proper.

## II. EXCLUSION OF THE DRAFT PLEA AGREEMENT

Fell assails the district court's exclusion of a draft plea agreement on the ground that it was mitigation evidence that rebutted the government's position that Fell had not accepted responsibility. *See Green v. Georgia*, 442 U.S. 95, 97 (1979). Fell's argument is driven by two contentions. First, he argues that the trial court misapplied the FDPA's evidentiary standards governing the admission of evidence. Second, he claims that the exclusion of the agreement denied him an opportunity to rebut the government's misrepresentations about his willingness to plead guilty and accept responsibility. We disagree.

In 2001, the parties considered a plea agreement under which Fell would plead guilty to Count 2 of the original Indictment – – kidnapping Teresca King with death resulting – – in exchange for a sentence of life imprisonment. The proposed plea agreement detailed "substantial mitigating evidence" related to Fell's "mental health and impaired capacity at the time of the events[;] . . . his mental health history; his youth; his remorse; his assistance to authorities; and his lack of any substantial prior criminal history." *Id.* at 782. Fell and his attorneys signed the agreement, but the prosecutors did not. Under Department of Justice guidelines, the proposed

24

agreement was expressly conditioned on approval by the Attorney General, after which the U.S. Attorney for the District of Vermont could sign the agreement.[11] The Attorney General rejected Fell's agreement and the government filed notice that it would seek the death penalty.

In a pre-trial submission, the government moved to bar admission of the draft agreement as well as information surrounding plea negotiations at the guilt and penalty phases of the trial. *Fell*, 372 F. Supp. 2d at 781. The government characterized the plea agreement, a conditional offer that was subject to acceptance by the Attorney General, as containing the unendorsed opinion of the prosecution and embodying inchoate compromise negotiations barred by Federal Rules of Evidence 408 and 410. Fell agreed that the evidence was irrelevant at the guilt phase, but opposed the motion, claiming that the proposed agreement contained binding judicial admissions that substantial mitigating factors existed. He also contended that the Fifth and Eighth Amendments as well as § 3593(c) of the FDPA compelled admission of the draft.

On May 26, 2005, the district court excluded the draft plea agreement – – and statements made during plea negotiations – – as irrelevant because "a prosecutor's statements of personal belief regarding [aggravating and mitigation] factors should have no bearing on the jury's

---

[11] Those guidelines provide that where a charged offense is subject to the death penalty, the United States Attorney is required to prepare a prosecution memorandum, including a comprehensive discussion of, among other information relevant to the charging decision, evidence relating to any aggravating or mitigating factors and the defendant's background and criminal history. U.S. Attorneys Manual § 9-10.01-05. The material is reviewed by a Committee appointed by the Attorney General, which makes a recommendation to the Attorney General, who then decides whether the Government will seek the death penalty. After considering the committee's recommendation, the views of the relevant U.S. Attorney, and the advice of the Deputy Attorney General, the Attorney General will make the final decision on whether the government should file a notice of intention to seek the death penalty in a particular case. *Id*. at § 9-10.120.

independent evaluation of the evidence." *United States v. Fell*, 372 F. Supp. 2d 773, 783 (D. Vt. 2005). The court also emphasized that the statements in the proposed plea agreement were never adopted by the government. *See id.* It concluded that while the draft's probative value was negligible because "the opinions of the prosecutors [did not] make the existence or non-existence of any mitigating factor more probable or less probable," *id.*, it could prejudicially distract the jury from making its own independent evaluation of the mitigating and aggravating factors. Finally, the court determined that public policy disfavored evidence that would deter plea bargaining.

However, the district court permitted Fell to introduce during the penalty phase a stipulation that he had offered to plead guilty to Count 2 in exchange for a sentence of life imprisonment without parole. In the court's view, Fell's "offer [was] relevant to the mitigating factor of acceptance of responsibility." *Id.* The stipulation informed the jury that "on May 18th, 2001, Donald Fell, through his attorneys and in writing, offered to plead guilty to Count II of the indictment, kidnapping, death resulting, in exchange for a life sentence without the possibility of release. The government refused that offer." In summation, defense counsel contended that Fell's attempt to plead guilty demonstrated that he had accepted responsibility, assisted law enforcement, and felt remorse. In response, the government argued in closing:

> Ladies and gentlemen, the judge instructed you. You know the law. Life
> imprisonment without the possibility of release is the minimum sentence that
> Donald Fell faces for kidnapping with death resulting. It's the minimum sentence.
> When he offered to make that plea, he knew the evidence against him was
> overwhelming. He knew there was no doubt he was going to be convicted, so he
> asked for the minimum sentence. We rejected that, ladies and gentlemen. We
> wanted a jury to decide the appropriate sentence in this case. And, ladies and

gentlemen, let's take a look at the last part of this: He's maintained that offer to this day.

Ladies and gentlemen, we had to try and convict him. If he wanted to plead guilty, he could have pled guilty. We had a guilt phase in this case, ladies and gentlemen. We put on our case. We met our burden. We proved it. And now we are here to decide what is the just sentence. The minimum sentence? Or death sentence.

Fell did not object or request a curative measure at the time. When he moved for a new trial, he argued that the government committed misconduct by taking inconsistent positions with respect to the facts underlying the stipulation. By minimizing Fell's cooperation and acceptance of responsibility, he contended, the government took a position inconsistent with that which it had set forth in the draft plea agreement. This alleged misconduct, Fell urged, entitled him to be re-sentenced to life imprisonment or to receive a new sentencing hearing. The district court denied the motion.

On appeal, Fell renews his objection to the court's exclusion of the draft agreement and mounts an expanded challenge to the government's allegedly improper rebuttal comments. As to the agreement, he argues that the court violated the FDPA because the draft agreement was relevant to the mitigation factors. He also makes a two-fold claim regarding the government's misconduct. First, Fell believes that once the prosecution commented in its closing argument on his refusal to plead guilty, he should have been permitted to introduce the draft agreement as rebuttal evidence. Second, he avers that the government's intimations about his refusal to plead guilty impermissibly burdened his right to plead not guilty. Since Fell failed to object to the prosecution's comments, we review for plain error. While we see none with respect to the

27

court's exclusion of the draft agreement, the prosecutor's remarks present a more complicated question.

In cases governed by the FDPA, the Federal Rules of Evidence do not apply at the penalty phase. *See* 18 U.S.C. § 3593(c); *Fell I*, 360 F.3d at 143. The FDPA provides that information relevant to the sentence, including any mitigating or aggravating factor:

> is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury. . . . The government and the defendant shall be permitted to rebut any information received at the hearing, and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any aggravating or mitigating factor, and as to the appropriateness in the case of imposing a sentence of death.

18 U.S.C. § 3593(c). *See Fell I*, 360 F.3d at 146 (upholding the constitutionality of this provision of FDPA and collecting cases so holding).

Accordingly, a capital defendant has a right to introduce "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[12] *Lockett v. Ohio*, 438 U.S. 586, 604

---

[12] In *Fell I*, we concluded that "to achieve such 'heightened reliability' [as required in considering a sentence of death], *more* evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors." *Fell I*, 360 F.3d at 143 (emphasis in original); *see also Gregg v. Georgia,* 428 U.S. 153, 203-04 (1976) ("So long as the evidence introduced . . . at the presentence hearing do[es] not prejudice a defendant, it is preferable not to impose restrictions. . . . [and] desirable for the jury to have as much information before it as possible when it makes the sentencing decision."). However, even though the FDPA purportedly allows more evidence to be considered in the penalty phase of a capital case, "the presumption of admissibility of relevant evidence is actually narrower under the FDPA than under the FRE." *Fell I*, 360 F.3d at 145. "[T]he balancing test set forth in the FDPA is, in fact, more stringent than its counterpart in the FRE, which allows the exclusion of relevant evidence 'if its probative value is *substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id*. (citing Fed. R. Evid. 403) (emphasis added). The FDPA requires only

(1978) (emphasis in original). The Supreme Court recognized, however, that its holding did not "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12. Likewise, the FDPA's evidentiary standards do "not mean that the defense has *carte blanche* to introduce any and all evidence that it wishes." *United States v. Purkey*, 428 F.3d 738, 756 (8th Cir. 2005). Nor does the FDPA "eliminate th[e] function of the judge as gatekeeper of constitutionally permissible evidence." *Fell I*, 360 F.3d at 145.

The court's exclusion of the draft agreement was within its "traditional authority" to exclude evidence of questionable relevance. The district court appropriately concluded that, pursuant to 18 U.S.C. § 3593(c), the draft agreement's inclusion of the unadopted statements of the prosecutors lacked evidentiary value and that it would distract the jury from an independent assessment of the mitigating factors. In addition, admission of the draft would authorize a confusing and unproductive inquiry into incomplete plea negotiations. *See Berger v. United States*, 295 U.S. at 88 (stating that the opinions of prosecutors should properly carry no weight with the jury); *accord United States v. Melendez*, 57 F.3d 238, 240-41 (2d Cir. 1995). For these reasons, we see no error – – much less abuse of discretion – – in the district court's decision to exclude the opinions of the prosecutors set forth in the draft plea agreement.

Fell next argues that the prosecutor misrepresented his willingness to plead guilty by stating, in closing argument, that "if [Fell] wanted to plead guilty he could have." Fell contends that, in order to correct this purported misrepresentation, he should have been allowed to

that the probative value be "outweighed" by such dangers. *See* 18 U.S.C. § 3593(c).

29

introduce the draft agreement in rebuttal. Further, Fell maintains that the prosecution's remark implicated his right to plead not guilty and avail himself of a jury trial.

Because Fell did not preserve his challenge at trial, we review for plain error and conclude that the prosecution's statement falls well short of meeting this test. First, the draft agreement did not need to be admitted in rebuttal to the prosecution's statements. To the extent Fell sought to introduce the draft agreement to bolster his mitigation defense that he accepted responsibility and to counter the prosecution's comments that he did not, the agreement was cumulative of the stipulation informing the jury that the government refused his offer to plead guilty. In any event, the record is virtually conclusive that the jury was clearly aware of Fell's willingness to plead guilty. On the verdict form, all twelve jurors found that "Donald Fell offered to plead guilty to kidnapping and murdering Teresca King, knowing that the law requires a sentence of life in prison without the possibility of release, and he has maintained that offer to this day." In addition, six jurors found the mitigating factors addressed in the agreement – – concluding that Fell had "admitted responsibility for the death of Teresca King" and had "assisted law enforcement." Regardless, all twelve jurors unanimously found that the government had established each of the alleged aggravating factors. In view of the jurors' responses, even if the agreement had been admitted and an additional six jurors had found that Fell had admitted responsibility, the result of the penalty phase would not have been different.

Fell's constitutional objection to the government's comments that as a consequence of his plea of not guilty, the government "had to try to convict him" and "if [Fell] wanted to plead

30

guilty, he could have pled guilty" requires a different analysis.[13]  Fell contends that this argument constituted an improper attempt, in violation of the Fifth and Sixth Amendments, to defeat a mitigating factor and impermissibly penalize him for pleading not guilty.  Fell first challenged these comments in his motion for a new trial only on the due process ground of the inconsistency between the prosecution's original view that the existence of mitigating evidence warranted plea negotiations and its position during the penalty phase that any mitigating factors were far outweighed by the aggravating circumstances of the case.  *Fell*, 2006 U.S. Dist. LEXIS 24707, at *33.  Since no mention was made of the Sixth Amendment below, we review his claim for plain error.

We have held that, when addressing the jury, a prosecutor "must avoid commenting in a way that trenches on the defendant's constitutional rights and privileges.  For example, []he may not permissibly comment on the failure of the defendant to testify, or invite the jury to 'presume' in the absence of countervailing evidence that the government's view of the case is correct, or

---

[13]     The prosecutor had previously stated that:
[D]efense counsel . . . told you in his opening statement that Donald Fell accepted responsibility for what he did.  But that's not entirely true because as the judge told you on the first day of trial Donald Fell has pleaded not guilty.  And because he pleaded not guilty a jury must find whether or not the Government can introduce evidence beyond a reasonable doubt to overcome the presumption of innocence that the law provides to Donald Fell.
. . . .
[D]efense counsel also said that Fell accepts responsibility for what he did.  But he pleaded not guilty.  And that's why we're here.  And that's why you are here.  And let's think a little bit about that.  Think about the very nature of the crimes that he's charged with.  They are all about evasion, about escape, about trying to avoid responsibility for what he did.

31

suggest that the defendant has any burden of proof or any obligation to adduce any evidence whatever." *United States v. Parker*, 903 F.2d 91, 98 (2d Cir. 1990). In order to prevail on a claim of prosecutorial misconduct, a defendant must demonstrate "that the prosecutor's remarks were improper and . . . that the remarks, taken in the context of the entire trial resulted in substantial prejudice." *United States v. Bautista*, 23 F.3d 726, 732 (2d Cir. 1994).

The challenged comments occurred in response to Fell's endeavor to use the stipulation of his offer to plead guilty to prove acceptance of responsibility as a mitigating factor. In summation, the prosecution sought to place the stipulation in context by noting that, when faced with overwhelming evidence of his guilt, Fell offered to plead guilty in exchange for the minimum penalty authorized for his conduct. When this offer was not accepted, the government proceeded to a trial that Fell could have avoided by pleading unconditionally. At that trial, the government was put to a burden which it met. We believe these arguments – – which the jury was repeatedly told were not evidence – – were reasonable responses to Fell's use of the stipulation. No error occurred. *See Darden*, 477 US at 183.

III. PROSECUTOR'S STATEMENTS REGARDING CONSIDERATION OF MITIGATING FACTORS

Fell next contends that he was denied a fair sentencing hearing because the prosecutor erroneously argued that the jury could not consider mitigating evidence that was unrelated to the crimes for which he had been found guilty. During summation, the prosecutor made the following arguments:

> [Y]ou should consider, one, [w]hat do these factors have to do with the crimes in this case? And do these factors actually lessen the defendant's responsibility and culpability for these crimes? . . . [E]ven if you find evidence of some of those mitigating factors, we submit to you that the weight of these factors is not that

32

heavy, and you need not give them much, if any, weight based upon those two questions . . .

. . . you have heard so much about the defendant's childhood, so much about his background, and again, let me just remind you, the question is, we submit to you, what's the connection between his background and childhood and these crimes? What about his background and childhood makes him less responsible, less culpable? What about them means that he should receive a less – a lesser sentence?

The question is, what does that sexual assault when he was four or five have to do with the crimes in this case? Sixteen years later, there's nothing sexual about these crimes. There's nothing about that background and that history that shows you that he is less responsible for the decisions that he made, decisions like killing a witness. How does that have to do with what happened to him, which was terrible?

What's the evidence of the mitigating factors? To the extent you find some, there are not that many, respectfully, and they really don't relate to the crimes.

Fell maintains that these closing comments, by suggesting that the relevance of his

mitigating evidence depended on its connection with his crimes of conviction, violated the

constitutional and statutory rule that before imposing the death penalty, a jury must "be able to

consider and give effect to a defendant's mitigating evidence . . . ." *Penry v. Johnson*, 532 U.S.

782, 797 (2001) (requiring that a jury "be able to consider and give effect to a defendant's

mitigating evidence in imposing [its] sentence . . . ."); *accord Lockett*, 438 U.S. at 604. A capital

defendant's mitigating evidence need not have a nexus to the murder for which he has been

convicted, but need only allow "the sentencer to reasonably find that it warrants a sentence less

than death." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004); FDPA § 3592(a)(8) (defining

mitigating evidence as "factors in the defendant's background, record, or character or any other

circumstance of the offense that mitigate against imposition of the death sentence"); FDPA

§ 3593(c) (providing that "[a]t the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592").

Following the jury's recommendation of a death sentence, Fell moved for a new trial based on his claim of improper statements by the government. The district court denied the motion, holding that – – in the context of the entire proceeding and specifically, in light of its instructions to the jury – – Fell had not been denied due process.[14] Reviewing for plain error, we agree that

---

[14]    Although the district court denied the motion, it acknowledged that the government had impermissibly "argued that there must be a connection between Fell's background and childhood and the crimes." It further noted that "[t]he government tied acceptable argument with its unacceptable comments [by] stating that the jury need not give much if any weight to Fell's background and childhood evidence based upon its irrelevance to the crimes he committed." *Fell*, 2006 U.S. Dist. LEXIS 24707, at *39.

Judge Walker and Judge Cabranes regard the prosecutor's comments as acceptable arguments about the weight of the evidence. They note that the cases on which the district court relied deal with the scope of a court's authority to exclude evidence that "[r]easonable jurists could conclude . . . was relevant mitigating evidence." *Tennard*, 542 U.S. at 288; *McKoy*, 494 U.S. at 442 ("Under our decisions, it is not relevant whether the barrier to the sentencer's consideration of all mitigating evidence is interposed by statute, by the sentencing court, or by an evidentiary ruling."(quoting *Mills*, 486 U.S. at 375 (citations omitted))). They further note that the Supreme Court has never held that, when arguing the weight of the evidence, a prosecutor may not question the connection between mitigating evidence and the defendant's crime of conviction. Finally, they conclude that the prosecutorial comments at issue in the instant case do not differ in substance from the comments that the Supreme Court found acceptable in *Boyd*e. *See, e.g.*, 494 U.S. at 385 (noting that the prosecutor had "argued to the jury that the mitigating evidence did not 'suggest that [Boyde's] crime is less serious or that the gravity of the crime is any less' and that '[n]othing I have heard lessens the seriousness of this crime'") (quoting *Boyde* trial record). In sum, they do not see the prosecutor's observations about the lack of nexus between Fell's mitigating evidence and Fell's crime of conviction as "separate" from the prosecutor's arguments about the weight that the jury should accord to that mitigating evidence. It is not improper for a prosecutor to argue that, because such a nexus is absent, the mitigating evidence should be given little or no weight.

Judge Parker, on the other hand, agrees with the district court that the prosecutor permissibly argued that the weight of the mitigating evidence did not lessen Fell's culpability, *see Boyde*, 494 U.S. at 385, but impermissibly suggested that the juror should disregard the

34

there was no reasonable likelihood that the jurors believed themselves to be precluded from considering Fell's mitigating evidence unless it related to his charged crimes. *See Ayers v. Belmontes*, 127 S. Ct. 469, 480 (2006); *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990).

In its charge to the jury, the district court defined mitigating factors as those relating to Fell's childhood and background and instructed the jury to consider all aggravating and mitigating factors in rendering its decision. Specifically, the court instructed that:

> [a] mitigating factor is not offered to justify or excuse a defendant's conduct. A mitigating factor is simply an extenuating fact about a defendant's life or character, or about the circumstances surrounding the murder, or anything else relevant that would suggest that a sentence of life in prison without the possibility of release is more appropriate punishment than a sentence of death.

The court listed the mitigating factors that Fell had presented and told the jury that they could consider any additional mitigating factors that had not been specifically raised by Fell's counsel.

The court also instructed the jurors that the arguments of counsel were not evidence and that if any conflicted with the court's instructions, the latter controlled. Specifically, the jurors were told that mitigating and aggravating factors "have to do with the circumstances of the crime, or *the personal traits*, *character, or background of the defendant*, or anything else relevant to the

---

mitigating evidence because it did not "connect" to the charged crimes. He focuses on the prosecution's language: 'What's the evidence of mitigating factors? To the extent that you find some, there are not that many, respectfully, and they don't really relate to the crimes" as demonstrating that the prosecution improperly contended that mitigation evidence could be ignored because it bore no nexus to the crime. *See Tennard*, 542 U.S. at 285 (concluding that "the Eighth Amendment requires that the jury be able to consider and give effect to a capital defendant's mitigating evidence") (internal citations omitted). He further believes that *Boyde* has no applicability where a prosecutor makes, in addition to an argument challenging the weight of the mitigating evidence, a separate argument questioning the relevance of that evidence.

Regardless, we need not resolve these differences as we find that Judge Sessions correctly held that the government's comments were not prejudicial.

35

sentencing decision." Moreover, the court's instructions, as a whole, "made it clear that the jury was to take a broad view of mitigating evidence." *Ayers*, 127 S. Ct at 478.

In light of these thorough instructions, as well as the amount of time and attention devoted to Fell's early life experiences by both parties and the fact that the prosecutor's comments formed a very brief part of his summation and were not repeated during his rebuttal, it is extremely unlikely that the jury felt constrained in its consideration of Fell's mitigating evidence. *See Boyde v. California*, 494 U.S. 370, 384 (1990) ("[A]rguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law." (internal citation omitted)); *cf. Brown v. Payton*, 544 U.S. 133, 146 (2005) ("The judge is, after all, the one responsible for instructing the jury on the law, a responsibility that may not be abdicated to counsel.").

Indeed, the verdict form bears out this conclusion. The jury unanimously found eight background mitigating factors, including that Fell was sexually and physically abused as a child, that he was treated and institutionalized on several occasions due to mental health problems and that his parents were violent alcoholics who abandoned him. Significantly, ten individual jurors found additional mitigating factors not expressly provided by the defense: "total life experience, failure of the state['s] . . . social and mental health services to effectively intervene in his childhood abuse and to treat or address his early antisocial behavior." No juror could have

36

reached such conclusions while believing that to qualify as a mitigating factor, that factor need have a nexus to the crime.

## IV. MENTAL HEALTH EVIDENCE

Fell next argues that the government committed misconduct by violating a district court order concerning mental health evaluations. During the course of plea negotiations in 2001, the defense provided a variety of mitigation information to the government, including the disclosure that it had hired experts to conduct mental health evaluations of Fell. After rejecting the proposed plea agreement and filing its notice of intent to seek the death penalty, the government moved for discovery of all mental health evidence and for Fell to submit to an examination by a government expert. Although the court never ruled on this motion,[15] the defense voluntarily produced the reports and agreed to limited evaluations by two government experts, doctors Richard Wetzel and John Rabun. *Fell*, 372 F. Supp. 2d at 758. The district court later observed that the limitations were appropriate because "in absence of Fed. R. Crim. P. 12.2(c), Fell's statements could be used

---

[15] In late 2002, Federal Rule of Criminal Procedure 12.2 was amended to codify a common-law sanctioned practice of the court ordering discovery and mental health examinations by the government's experts upon notice by the defendant of intent to produce mental health evidence. FED. R. CRIM. P. 12.2 advisory committee's note (2002)

as evidence against him at trial."[16]  *Fell*, 372 F. Supp. 2d at 758.  Drs. Wetzel and Rabun both produced reports based on their examinations of Fell.

After we decided *Fell I*, in December 2004, the defense gave formal notice that it planned to introduce expert evidence on Fell's mental condition.  *See* FED. R. CRIM. P. 12.2(b).[17] Subsequent to that announcement, the government moved for a court-ordered examination of Fell's mental health pursuant to Federal Rule of Criminal Procedure 12.2(c)(1)(B).  The

---

[16]     The 2002 amendments to Rule 12.2 also allowed the government to admit statements made by a defendant during a medical examination by a government expert if the defendant had introduced his own expert mental health evidence.  FED R. CRIM. P. 12.2 advisory committee's note (2002).  The rule now provides that:

> No statement made by a defendant in the course of any examination conducted *under this rule* (whether conducted with or without the defendant's consent), no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant:
> (A) has introduced evidence of incompetency or evidence requiring notice under Rule 12.2(a) or (b)(1), or
> (B) has introduced expert evidence in a capital sentencing proceeding requiring notice under Rule 12.2(b)(2).

FED. R. CRIM. P. 12.2(c)(4) (emphasis added).


[17]     Rule 12.2(b) requires that:

> If a defendant intends to introduce expert evidence relating to a mental disease or defect or any other mental condition of the defendant bearing on either (1) the issue of guilt or (2) the issue of punishment in a capital case, the defendant must -- within the time provided for filing a pretrial motion or at any later time the court sets – notify an attorney for the government in writing of this intention and file a copy of the notice with the clerk. The court may, for good cause, allow the defendant to file the notice late, grant the parties additional trial-preparation time, or make other appropriate orders.

FED. R. CRIM. P. 12.2(b).

government then requested an unrestricted examination of Fell by a third expert, Dr. Michael Welner, it had retained in early 2004. Specifically, the government sought to have Welner question Fell regarding his state of mind at the time of the murders. *Fell*, 372 F. Supp. 2d at 759. The series of events that followed is somewhat complicated.

The defense objected to the need for a new examination and to the government's use of a third expert for this purpose. On April 7, 2005, the district court ruled that the government should be allowed a further examination to assess Fell's mental condition at the time of the offense. *Id.* at 779. However, because Rabun and Wetzel had already conducted extensive interviews exploring both mitigating and aggravating circumstances "at a time closer to the relevant events," *id.* at 761, the court ruled that their opinions would satisfy Rule 12.2 "while at the same time not subjecting Fell to an extensive forensic interview by a new expert at this late stage in the proceeding," *id.* at 762. The order accompanying the district court's opinion provided that the examination "may be conducted by Dr. Rabun or Dr. Wetzel, or both," and that the examiner would be permitted to conduct a complete psychiatric examination. The same order required that prior to any examination by an expert for the government, the government would provide defense counsel with a list of the tests to be performed, and that the government and defense should attempt to resolve any disagreement as to "the designation of specific testing measures to be administered by the defense and prosecution witnesses." Finally, the order stated that the government "shall not identify more than one test for the purpose of measuring the same mental function," and that "[n]o mental health test may be performed by either party until there is a final decision as to what tests are to be conducted by the government's experts."

The government, on April 14, 2005, renewed its request to have Fell examined by Welner, claiming that Rabun and Wetzel had not been retained to assist in the penalty phase, but rather, merely with regard to plea negotiations. *Fell*, 372 F. Supp. 2d at 778. At the same time, Fell moved to exclude Welner's testimony on the grounds that it would be either cumulative or contradictory of the testimony provided by Rabun and Wetzel at the guilt phase and that Welner's testimony might relate to future dangerousness – – an aggravating factor not alleged by the government. The court denied both requests on May 26, 2005. *Fell*, 372 F. Supp. 2d at 781. It rejected the government's contention that Rabun and Wetzel were hired only to advise the government concerning plea negotiations, and indicated that the government violated "the spirit, if not the language," of its original agreement with the defense by deciding after two years that it wanted a new expert. *Id*. The court also denied as premature Fell's motion to exclude Welner's testimony, holding that the nature and scope of Welner's anticipated rebuttal testimony was unclear but that, even without interviewing Fell, his testimony might "shed light on Fell's upbringing and other relevant factors concerning sentencing." *Id*. Accordingly, the court declined to rule on admissibility prior to the government's disclosure of the scope of Welner's projected testimony.

Pursuant to the court's April 7, 2005 order, Wetzel interviewed Fell and prepared a report explaining his findings. *Fell*, 2006 U.S. Dist. LEXIS 24707, at *8. A video recording of the Wetzel interview was subsequently provided to Welner who compiled a report based on that interview. At the sentencing phase of the trial, Fell moved to exclude parts of Wetzel's report and also sought a copy of Welner's report. On July 5, 2005, after the government had rested, it

disclosed Welner's report as ordered by the district court. The report revealed that Welner had supplied questions for Wetzel to ask Fell and had administered psychological tests that had not been previously disclosed to the defense – – the Psychopathy Checklist-Revised ("PCL-R"), the Violent Risk Appraisal Guide ("VRAG"), and the Historical/Clincal/Risk Management (HCR-20) – – to assess Fell's capacity for future violence. *Id*. at *13. Welner admitted that in scoring the PCL-R, he relied on Wetzel's videotaped interview. Welner's assessment based on these tests was that Fell was a psychopath and that sexual and physical abuse had played little role in his development.

The following day, Fell moved to exclude Welner's report and testimony, arguing that by supplying questions for Wetzel to ask him, Welner had used Wetzel as a proxy for interviewing Fell in violation of the court's April 7 order and that the government administered new testing without providing notice. The court scheduled a hearing on July 11 to address this issue and others regarding Welner's proposed testimony. Before the hearing took place, however, Fell changed course and elected not to call a mental health expert.[18] *Id*. at *15. The next day, the defense and the government entered into a stipulation to the effect that Fell suffered from no mental disease or defect and knew the difference between right and wrong at the time of the

---

[18] Prior to this, Fell had already decided not to call another mental health expert, Dr. Mills, as part of its mitigation case. Mills was scheduled to testify on the first day of the defense's case, but the defense decided that it would save Mills's testimony for surrebuttal.

murders.[19] As a result, the government presented no mental health evidence during the penalty phase. *Id*. at *15-16.

In his motion for a new trial, Fell argued that the government's conduct in connection with Welner's examination "precluded the jury's consideration of mitigation evidence by causing Fell to withdraw all expert mental health evidence." The district court concluded that although the government had violated its April 7 order, "[w]hen Fell decided to drop any presentation of expert evidence on his mental condition while a challenge to the admissibility of the government's expert rebuttal evidence was pending, he also dropped his claim of misconduct by the government in obtaining its rebuttal evidence." *Id*. at *31-32. We agree. *Cf. United States v. Wellington*, 417 F.3d 284, 289-90 (2d Cir. 2005) (ruling that where defendant chose to stipulate to the elements of the offense, he waived his right to challenge the absence of opening statements, witnesses, evidence and closing statements at his trial).

Given the compelling case for waiver, on appeal Fell takes a somewhat different approach by arguing that it was improper for the district court to delay ruling on his motion to exclude Welner's testimony until after the government had disclosed the scope of that testimony. He

---

[19]    The full stipulation provided:

[A]fter his arrest in late 2000, Donald Fell was subjected to full psychological and psychiatric examinations. Those examinations determined that, one, he had no cognitive or neurological deficits; two, his intellect and cognitive functions were intact; three, he did not suffer from any mental disease or defect. The examination also found that fell was competent to stand trial, and knew the difference between right and wrong at the time of offenses on November 27, 2000.

Tr. 7/12/05, pg. 93-94

42

claims that "defense counsel was entitled to a ruling on the admissibility of Welner's testimony *before* presenting its mitigation case" and that the trial court's failure to do so before he was forced to decide whether or not to present his own expert testimony prevented him from making a knowing and informed decision. Since Fell never objected to the scheduled date of the hearing on the admissibility of Welner's testimony, we review this claim for plain error.

As an initial matter, Fell has failed to establish that it was error for the court to schedule a hearing on Welner's testimony at the end of the defense's mitigation case. "Scheduling is a matter that is of necessity committed to the sound discretion of the trial court." *Drake v. Portuondo*, 321 F.3d 338, 344 (2d Cir. 2003); *see also Grotto v. Herbert*, 316 F.3d 198, 206 (2d Cir. 2002). The district court postponed its consideration of the scope of Welner's rebuttal testimony to permit it to first assess the nature and scope of the defense expert's testimony. This approach was a sensible one that we are not inclined to second guess. Fell's contention that the court *could* have made a determination on admissibility without reference to the evidence that the defense intended to submit misses the point. We find no error in the district court's handling of this matter, and therefore no plain error.

## V. Satanism and Other Religious Evidence

Fell next contends that testimony elicited by the prosecution concerning a past interest in satanism and his interest, while incarcerated and awaiting trial, in Native American and Muslim religions denied him due process and violated the First Amendment. *See Dawson v. Delaware*, 503 U.S. 159, 163-69 (1992). Fell's claims relate to the testimony of three witnesses called by

43

the defense: Teri Fell, the defendant's sister; James Rushlow, a case worker at Northwest Correctional Facility; and James Aiken, an expert witness in penology.

Teri Fell testified on direct examination about the abusive and violent home life she and her brother experienced. On cross-examination, when the government inquired as to his religious interests when they were growing up, she testified that Fell initially did not believe in God and on several occasions jokingly characterized Satan as "the kindest beast." She also testified that Fell had a tattoo of an upside-down cross with "666," which she believed he had gotten when he was 15 or 16 years old. However, Teri Fell explained that she did not believe that Fell worshiped Satan.

James Rushlow testified on direct examination as to Fell's adjustment in prison and his participation in certain religious and educational opportunities afforded by the institution. On cross-examination, the prosecution confirmed that Fell had signed up for Christian Bible Studies, and asked Rushlow: "During your time working with Mr. Fell, has he also claimed to practice Native American rituals?" In response, Rushlow testified that Fell had filed a grievance and a lawsuit seeking the right to perform Native American rituals. With no objection from the defense, the government introduced into evidence a certified copy of the record in that litigation.[20] Rushlow further stated that Fell had wanted to participate in Ramadan, as a Muslim, and that he had filed numerous other grievances for himself and on behalf of others. In addition,

---

[20] Defense counsel stated that he had no objection to the certified record being entered into evidence but he "may well" have an objection to Rushlow being asked to comment on it.

Rushlow testified, without objection, that Fell had both a "666" tattoo and one of an anarchy symbol.

The defense called James Aiken to testify further about Fell's positive adjustment in prison. The government cross-examined Aiken regarding the possibility of Fell committing future assaults, and asked him to describe the significance of Fell's "666" tattoo. He responded:

> Well, the 666 denotes possible involvement in some type of relationship with an organization. I will leave it at that because I have not dwelled into that from the intelligence reports. Number two is that I am more concerned about who he's controlling at the prison. And he's not controlling anybody.

The prosecutor's summation made no reference to Fell's tattoos or Fell's purported satanic interest and made no attempt to explain the relevance of this evidence to the murders. The prosecutor did, however, argue that Fell had not made positive contributions while incarcerated because he generated numerous grievances and filed a lawsuit which was predicated on a feigned interest in multiple religions.[21]

The First Amendment forbids the uncabined reliance on a defendant's "abstract beliefs" at sentencing. *Dawson*, 503 U.S. at 166-67; *see also Wisconsin v. Mitchell*, 508 U.S. 476, 485-

---

[21] Specifically, the government argued that:

> They want to claim that he is [*sic*] a positive contribution in resolving grievances? You heard from Jason Rushlow. The man generated grievances. Are you kidding me? You saw the lawsuit. You can read it for yourself when you go back there. This man signs up for bible study, and then files a lawsuit claiming to be American . . . a Native American. He files a lawsuit so that he can practice his Native American religion on the yard. It's bogus, ladies and gentlemen. You know it's even more bogus, because, believe it or not, he observes Ramadan as a Muslim.

86 (1993) ("[A] defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge"). However, the government may introduce evidence of beliefs or associational activities, so long as they are relevant to prove, for example, motive or aggravating circumstances, to illustrate future dangerousness, or to rebut mitigating evidence. *See United States v. Kane*, 452 F.3d 140, 143 (2d Cir. 2006) (per curiam); *see also Dawson*, 503 U.S. at 167; *Barclay v. Florida*, 463 U.S. 939, 948-49 (1983) (plurality opinion) (upholding the consideration of defendant's racial intolerance in evaluating motive and as an aggravating factor).

Because Fell did not raise a contemporaneous objection to the government's inquiry into his beliefs, his claim is subject to plain error review.[22] The crucial question is whether the evidence at issue was used for permissible purposes or merely to show that Fell was "morally

---

[22] Fell did not object during trial but asserts that the argument in his trial memorandum preserved the constitutional claim. The memorandum refers only to the possibility of the government arguing that the murders of Debra Fell and Charles Conway were the result of "a long established plan with possible satanic origins." As no mention is made of the government introducing Fell's interest in Native American and Muslim religions into evidence, there can be no colorable claim that any objection as to this issue was raised below. The objection in the trial memorandum as to the satanic evidence was specifically that the introduction of such evidence "would create a new aggravating circumstances [*sic*] which the government ha[d] not previously alleged," and would therefore violate the FDPA's requirement of formal notice. *See* 18 U.S.C. § 3593(a). This is not sufficient to preserve a First Amendment or due process challenge to the testimony at issue. *See United States v. Indiviglio*, 352 F.2d 276, 279-80 (2d Cir. 1965) (en banc) (requiring that "an objection state accurately the ground on which inadmissibility is claimed and state this with a reasonably degree of certainty. . . . to give the judge an opportunity to correct the error"); *accord United States v. Brown*, 352 F.3d 654, 662 (2d Cir. 2003) (ruling that a religion-based *Batson* claim was forfeited, where defendant only raised a race-based *Batson* challenge in trial court).

reprehensible" due to his "abstract beliefs." *Kane*, 452 F.3d at 143; *see Dawson*, 503 U.S. at 166-67.[23]

### 1. Native American and Muslim Religious Interests

We conclude that the testimony regarding Fell's interest in Native American and Muslim religions was relevant in the context in which the testimony was elicited. Fell undertook to prove the following mitigating factor: "Donald Fell has made positive contributions to the Northwest Correctional Facility by working, gaining an education, and helping to resolve inmate grievances." In support of this factor, Rushlow testified that Fell was picked by management to act as a unit representative for other inmates, took part in Bible study and other educational opportunities, and had a disciplinary record reasonably free of infractions. However, on cross-examination, Rushlow retreated from several of his prior assertions. He conceded that Fell did not "resolve inmate grievances" but instead "manufactured" grievances based on his purported religious beliefs. The government also showed that while Fell participated in Bible studies, he

---

[23]    S*ee also Miller-El v. Johnson*, 261 F.3d 445, 455 (5th Cir. 2001) (upholding introduction of evidence at sentencing of defendant's religious association because references to his membership "related to his involvement with other group members who were heavily armed" and was probative of future dangerousness) *rev'd on other grounds*, *Miller-El v. Cockrell*, 537 U.S. 322 (2003), *Fuller v. Johnson*, 114 F.3d 491, 498 (5th Cir. 1997) (distinguishing *Dawson* based on the fact that the government presented evidence that defendant was a member of a gang that had committed violent and unlawful acts); *Wainwright v. Lockhart*, 80 F.3d 1226, 1234 (8th Cir. 1996) (ruling that questioning of defendant on involvement in street gang "did not serve any proper rebuttal purpose" where "[t]here was no credible, admissible evidence that [the defendant's] crime was gang-related, that [the defendant] belonged to a gang or that gang membership would impeach [the defendant's testimony] about his religious beliefs"); *United States v. Robinson*, 978 F.2d 1554, 1565 (10th Cir. 1992) (rejecting a First Amendment challenge because "the government presented adequate expert testimony as to the meaning of the gang affiliation evidence").

47

simultaneously filed grievances and a lawsuit demanding that "sweat lodges" and "talking circles" be made available in the prison so that he could engage in Native American religious practices. During that same period, Fell also participated in Ramadan. The government elicited testimony that Fell was appointed unit manager in part because his familiarity with the administrative procedures, due to his constant filing of complaints, made it easier to have the other inmates funnel their grievances through him.

The jury was free to find that Fell had successfully adjusted to prison, was genuinely interested in several religions, and filed grievances for entirely legitimate purposes. By the same token, the jury was also free to find that Fell's interest in multiple religions was cynical or feigned and that his multiple grievances reflected a failure to adjust to incarceration. Contrary to Fell's contention that the evidence was intended to incite religious prejudice, the testimony was reasonably elicited to present a more complete picture of Fell that belied the one of a well-adjusted inmate offered by the defense. In any event, the evidence played a very minor role in the trial and added little to the quantum of evidence before the jury. We see no error and certainly no plain error in its admission.

## 2. Satanic Beliefs and "666" Tattoo

We are more troubled by the testimony that the government elicited regarding Fell's satanic beliefs and tattoos – – evidence that Fell argues was irrelevant to sentencing and intended to demonize him and frighten the jury. The government justified the cross-examination questioning as relevant to establishing motive, to explain the multiple killings, and to prove the "heinous, cruel and depraved manner" statutory aggravating factors. According to the

48

government, a satanist believes he "can murder rape and rob at will without regard for the moral or legal consequences", an inference buttressed by the fact that Fell committed the murders while wearing a "Slayer" t-shirt.[24]

Fell did not object to this evidence and therefore we review its admission for plain error. *See Jones*, 527 U.S. at 389-90. While evidence of the defendant's abstract moral beliefs may in some cases be constitutionally admissible to show motive, *see Kane*, 452 F.2d at 143, there must be stronger evidence of the connection than occurred here and it was a mistake for the prosecutor to offer the evidence. Although the government posits on appeal a relationship between the t-shirt Fell wore during the murders and Fell's satanic interests and his motive for killing Teresca King, we are not persuaded by the relevance of this evidence, which in any event was not argued to the jury. Nevertheless, to the extent that any unjustified reference to Fell's satanic beliefs occurring in the testimony constituted constitutional error, it was not challenged at trial and did not constitute plain error. It neither prejudiced Fell nor did it "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *See Gonzalez*, 110 F.3d at 945-46.

The strength of the government's case convinces us that Fell cannot show that any error prejudicially affected substantial rights. *See Jones*, 527 U.S. at 389. At trial, the government presented essentially uncontested evidence that there were multiple murders and that Fell killed King in "an especially heinous, cruel or depraved manner." The evidence of Fell's interest in satanism, an issue that occupied a very small amount of trial time, added little to this showing

---

[24] Slayer is a "heavy metal" band whose albums and lyrics cover topics such as serial killers, satanism, religion and warfare.

49

and subtracted even less from the extensive mitigation evidence presented by Fell. As the verdict suggests, the jury was highly attentive to the aggravating and mitigating evidence that mattered. Moreover, the district court controlled any risk of prejudice through its instruction to the jury that it could not consider Fell's religious beliefs in rendering its decision because those considerations are "completely irrelevant." In the special verdict form, each juror certified that he or she followed that instruction. For these reasons, we conclude that there was no plain error.

## VI. ADMISSION OF CONTESTED TESTIMONY

Fell next renews his challenge to the district court's admission, through the testimony of Marsha Thompson, of Debra Fell's non-testimonial hearsay statement that she was afraid of her son. He argues that this statement was repetitive of other similar statements that the district court struck as hearsay. In support of the mitigating factor that he had truthfully admitted his responsibility for King's murder, Fell contends that he previously gave several truthful confessions to law enforcement officers – – one of which included an accurate account of his relationship with his mother. In this confession, he recalled an incident at a local bar involving a physical altercation in which his mother was the aggressor.

The government called Thompson, the bartender at the local bar, to show that Fell had not given a truthful account of the altercation to the authorities investigating King's murder. Thompson testified that Fell aggressively struck his mother inside the bar and then assaulted her once they were outside of the bar. Thompson stated that she then called 911. After the police arrived and arrested Fell, his mother, highly distraught, returned to the bar and told Thompson that:

50

She couldn't take it. She didn't want to go back home. She was afraid to go home. And I said to her, why don't you have him leave your home if you are afraid of him. She said I can't he's my son and I love him.

Prior to Thompson's testimony, the district court ruled that Fell's mother's statement that "she was afraid of [Fell]" qualified as an excited utterance under Federal Rule of Evidence 803(2), a "firmly rooted" hearsay exception under *Ohio v. Roberts*, 448 U.S. 56, 63-66 (1980) (holding that the Confrontation Clause requires that a hearsay exception be firmly rooted and reliable). The court concluded that Thompson's testimony was relevant to impeach aspects of Fell's confession – – particularly "to rebut the defense's claim that Donald Fell gave a truthful confession" – – was reliable for Confrontation Clause purposes and was not unduly prejudicial under 18 U.S.C. § 3593(c). Because Fell preserved his objection to this testimony at trial, we review this evidentiary ruling for abuse of discretion. *Yousef*, 327 F.3d at 156.

No abuse of discretion occurred here. First, although Fell claims that his mother's statement was too attenuated to qualify as an excited utterance, "an excited utterance need not be contemporaneous with the startling event to be admissible." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). Rather, the key question governing admission is "whether the declarant was, within the meaning of Rule 803(2), 'under the stress of excitement caused by the event or condition.'" *Id.* (quoting *United States v. Scarpa*, 913 F.2d 993, 1017 (2d Cir. 1990)). We find that the stressful events surrounding the statement support applying the excited utterance rule. *See id.* at 113. In any event, the FDPA permits the admission of evidence at the penalty phase regardless of its admissibility under the Federal Rules of Evidence. *See Fell I*, 360 F.3d at 144. The district court correctly admitted this statement because it was relevant to rebut the mitigating

51

factor that Fell had truthfully admitted responsibility for Teresca King's murder. The statement was not unduly prejudicial and would not have misled the jury. *See* 18 U.S.C. § 3593(c). It was clear from a plethora of evidence that Fell and his mother had an estranged and pathological relationship and Thompson's testimony did little other than confirm what the jury already knew.

Fell also challenges the admission, through the testimony of Matt Cunningham – – a teenage friend of Fell's – – of prior statements conveying Fell's willingness to commit multiple murders and his desire to kill his mother. The evidence was offered in response to Fell's showing concerning the abuse and neglect he suffered at the hands of his parents. Fell argued that because the prejudicial value of the evidence exceeded its probative value, its admission violated the FDPA as well as the Fifth and Eighth Amendments. The government averred that the testimony was relevant to accurately complete the picture of Fell's formative years because, as we stated in an earlier opinion, "it is appropriate for the sentencing authority . . . to consider a defendant's whole life and personal make-up." *Fell*, 360 F.3d at 143. The district court permitted Cunningham to testify on the contested topics for the purpose of "describ[ing] the general background and character of Fell during his late teenage years."

Cunningham testified that during Fell's late adolescent years, he and Fell associated with a group of friends who drank, smoked marijuana, carried knives, and committed petty crimes. He further stated that although Fell rarely talked about his mother, when he did, he indicated that "he hated her," and would "say things like, 'I could kill her.'" Cunningham also recalled a conversation about murder in which Fell stated "something along the lines of, well, if you killed one person, why stop there? Because you are going to get the same punishment anyway . . . ."

The government commented, without objection by defense counsel, on Cunningham's

statements in its closing:

> You know as a matter of common sense that people have free will, and
> particularly when they grow up, they have free will to do the right thing and to
> decide what's right and what's wrong. And you know that for years, Donald Fell
> thought about killing. He thought about killing John Kozierski, his teacher, back
> when he was starting out in high school. A couple more years went by, and in
> conversations with Matthew Cunningham, a guy he hung out with back then, he
> thought about killing then. Talked about maybe killing his mother. And he
> thought, if you're going to kill someone, why stop at one.
>
> And more years went by, and he became an adult, and he came to Vermont, and
> after years of thinking about killing, he decided to kill, and kill again, and he had
> four hours to think about what to do with Terry King, and he decided to kill her
> too.
>
> People are responsible for what they do, particularly when they do severe, heinous
> crimes like this.

We review admission of this evidence for abuse of discretion. *United States v. Pepin*,

514 F.3d 193, 202 (2d Cir. 2008). At the sentencing phase, the defense adduced extensive

mitigating evidence showing that because Fell was the victim of tragic early life experiences, he

deserved a fate other than execution. Cunningham's testimony was offered, in the government's

words, "to correct the portrayal of Fell as simply a tormented youth consumed with his mother's

wrongs. That image is only possible if the critical few years between the ages of 17 and 20 – –

when Fell matured into an adult – – are ignored." The district court appropriately found that this

evidence was relevant to Fell's background and general character.

In addition to its probative value, this testimony was not unduly prejudicial. Despite

Fell's claim that a juror might have inferred that he planned his mother's murder, the government

never alleged premeditated murder as an aggravating factor and did not argue in closing that Fell

ever intended to kill his mother. Assuming arguendo, as Fell contends, that the Cunningham testimony presented a risk of unfair prejudice from a "bleed-over" effect potentially allowing the jury to find the unalleged aggravating factor – – that the murders were premeditated – – we are confident that the court's instruction that the jury only consider the charged aggravating factors adequately dealt with this remark.[25] Finally, it is unquestioned that the jury knew from other testimony that Fell was "extraordinarily angry" with his mother and that he watched Lee stab her multiple times without intervention.

## VII. CUMULATIVE EFFECT

Fell contends that even if none of the alleged errors warrants reversal, the cumulative effect of the government's misconduct and the district court's erroneous admission of evidence rendered the proceedings fundamentally unfair. It is well-settled in this circuit that the effect of multiple errors in a single trial may cast such doubt on the fairness of the proceedings that a new trial is warranted, even if no single error requires reversal. *United States v. Rahman*, 189 F.3d 88, 145 (2d Cir. 1999); *see also United States v. Salameh*, 152 F.3d 88, 157 (2d Cir. 1998).

Nonetheless, not every error – – whether alone or in combination with others – – warrants a new trial. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one."). As we have discussed, the trial conduct challenged by Fell either was not improper, was not prejudicial, or fails plain error review. The

---

[25] Although Fell summarily alleges Fifth and Eighth Amendment violations related to the admission of Cunningham's testimony, he offers no supporting arguments. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *see United States v. Crispo*, 306 F.3d 71, 86 (2d Cir. 2002) (applying this rule to a criminal appeal); Fed. R. App. P. 28(b).

district court's evidentiary rulings were thoughtful and meticulous; none approached an abuse of its broad discretion. Because considered singly, none of the errors claimed by Fell undermine our confidence in the fairness of the proceeding, we similarly conclude that, given the care and soundness with which this trial was conducted, "the cumulative error doctrine finds no foothold in this appeal," *Sampson*, 486 F.3d at 51. We now turn to Fell's remaining challenges.

## VIII. OVERLAP OF AGGRAVATING FACTORS

During the penalty phase, the district court instructed the jury to consider three statutory aggravating factors and four non-statutory aggravating factors, as well as nineteen mitigating factors. Fell argues that three of the non-statutory aggravating factors substantially overlapped because they rest on the same factual predicate – – that Fell intentionally participated in the death of King. He maintains that by finding this fact, the jury could more easily find aggravating factors and then more easily find that those factors outweighed the mitigating factors presented by Fell. Accordingly, Fell contends, the overlap of aggravating factors necessarily skewed the jury's decision-making in favor of the death penalty. We disagree.

The factors in question are:

(1) Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder.

(2) Donald Fell participated in the murder of King to prevent her from reporting the kidnapping and carjacking.

(3) Donald Fell participated in the murder of King after substantial premeditation to commit the crime of carjacking.

Fell also contends that during its closing argument, the government compounded this duplication. It emphasized the relationship of Fell's intentional participation in King's murder to the three non-statutory aggravating factors by stating: (1) "there is no doubt that [Fell] participated in the abduction of Terry King in order to get out of Rutland to avoid those double murders"; (2) "[Fell] made the decision she needed to die. This factor clearly proven again"; and (3) "[a]gain, there's no doubt that they chose Terry King. This was no random event."

Before deliberation, the district court instructed the jury:

> The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone if you find no mitigating factors, is by no means a mechanical process. In other words, you should not simply count the total number of aggravating and mitigating factors and reach a decision based on which number is greater; rather you should consider the weight and value of each factor. . . .
>
> The law contemplates that different factors may be given different weight or values by different jurors. Thus, you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factors proven, do not, standing alone, justify the imposition of death beyond a reasonable doubt.

After deliberating, the jury found unanimously that all of the aggravating factors, both statutory and non-statutory, existed beyond a reasonable doubt. In addition, seventeen mitigating factors were found by at least one juror, and eleven of those mitigating factors were found by at least ten of the twelve jurors.

Because this Circuit has not addressed the constitutionality of allegedly duplicative aggravating factors, Fell relies on the Tenth Circuit's decision in *United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996). *McCullah* held that under the Continuing Criminal Enterprise provision of the Anti-Drug Abuse Act, 21 U.S.C. § 848, aggravating sentencing factors that

56

impermissibly duplicate each other raise constitutional questions. *Id*. at 1111. The Tenth Circuit found that "[s]uch double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *Id*. Although the statute at issue in *McCullah*, like the FDPA, allows the jury to accord as much or as little weight to any particular factor as it views appropriate, the Tenth Circuit stated that when a sentencing body is asked, in essence, to weigh a factor twice, "a reviewing court cannot 'assume it would have made no difference if the thumb had been removed from death's side of the scale.'" *Id.* at 1112 (citing *Stinger v. Black*, 503 U.S. 222, 232 (1992)). *McCullah* thus stands for the proposition that when duplicative aggravating factors are used in the penalty phase, a reviewing court must re-weigh the factors and perform a harmless error analysis. *Id.* Applying this analysis, the *McCullah* court found that two sets of aggravating factors were duplicative because in each of them, "while the factors are not identical per se, [one] factor necessarily subsumes the [other] factor." *Id.* at 1111.

Three years after the Tenth Circuit's decision in *McCullah*, the issue of duplicative aggravating factors was considered by the Supreme Court in *Jones v. United States*, 527 U.S. 373 (1999), a case that reviewed a Fifth Circuit decision applying *McCullah*. The Fifth Circuit had found that two of the aggravating factors charged by the government were unconstitutionally duplicative. The Supreme Court declined to decide whether the Tenth Circuit's double-counting theory was either valid or appropriately applied by the Fifth Circuit. *Id.* at 398-99. Instead, the Court stated that "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid . . . . What we have said is that the weighing process may

57

be impermissibly skewed if the sentencing jury considers an invalid factor." *Id.* at 398 (citing *Stringer*, 503 U.S. at 232). Assuming for the sake of argument that the Tenth Circuit's theory in *McCullah* applied in *Jones*, the Court found that the two non-statutory aggravating factors at issue – – (I) the victim's "young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas" and (ii) the victim's "personal characteristics and the effect of the instant offense on [her] family" – – were not duplicative. *Jones*, 527 U.S. at 378 n.3. Instead, "at best, certain evidence was relevant to two different aggravating factors." *Id.* at 399-400. The Court also noted that "any risk that the weighing process would be skewed was eliminated by the District Court's instruction" to the jury that it should weigh the value of each factor rather than counting the number of factors on each side. *Id.*[26]

The government urges us to follow the lead of the Eighth Circuit in *Purkey*, 428 F.3d at 762, and the Fifth Circuit in *United States v. Robinson*, 367 F.3d 278, 292-93 (5th Cir. 2004), and find that a capital jury may permissibly be presented with duplicative aggravating factors. However, we are not required to decide this question because the statutory aggravating factors in

---

[26] Currently, the circuit courts are split as to whether duplicative aggravating factors are unconstitutional and as to the meaning of the Supreme Court's decision in *Jones*. The Fourth and Ninth Circuits have aligned with the Tenth Circuit and adopted their own variations of the rule in *McCullah*. *See Allen v. Woodford,* 395 F.3d 979, 1012-13 (9th Cir. 2005) (finding that it was unconstitutional for the court and the prosecutor to present the defendant's prior crimes as the heart of three different aggravating factors); *United States v. Tipton*, 90 F.3d 861, 900 (4th Cir. 1996) ("We agree with the *McCullah* court that . . . a submission . . . that permits and results in cumulative findings of more than one of the [statutory aggravating factors] is constitutional error."). In contrast, the Eighth Circuit has rejected the duplicative aggravating factor theory when applied to the FDPA, *see Purkey*, 428 F.3d at 762, and the Fifth Circuit has withdrawn its support of the double-counting theory in light of *Jones*, *see United States v. Robinson*, 367 F.3d 278, 292-93 (5th Cir. 2004) ("Although our case law once [supported the theory], the Supreme Court recently admonished that it does not support that theory of review.")

58

question do not impermissibly duplicate each other. Under *McCullah* and its Tenth Circuit progeny, aggravating factors are duplicative when one "necessarily subsumes" the other, *see Cooks v. Ward,* 165 F.3d 1283, 1289 (10th Cir. 1998), or, in other words, when a jury would "necessarily have to find one in order to find the other," *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir. 1999). Two factors are *not* duplicative merely because they are supported by the same evidence. *See Jones,* 527 U.S. at 399.

While the three non-statutory aggravating factors in the present case arguably overlap to a certain degree, no one factor necessarily subsumes another. Factors one and two both address the motive for Fell's acts of violence against King – – that he had committed a double murder and wanted to avoid capture. But these two factors differ because the first refers to the abduction of King, and the second specifically to her murder. These acts were separated by several hours in time. Accordingly, separate consideration of different facts was required for the jury to find each factor.

Nor does factor two subsume factor three, which provides that Fell "participated in the murder of King after substantial premeditation to commit the crime of carjacking." While addressing the same carjacking conduct as the other two factors, factor three focuses on premeditation rather than motive. These are similar but nonetheless distinct concepts, justifying separate consideration and separate findings. As in *Jones*, "at best, certain evidence was relevant to [the] different aggravating factors," 527 U.S. at 399, and the district court did not err in submitting these factors to the jury. Additionally, we conclude that the prosecutor's statements did not encourage the jury to confuse the factors. The government never suggested that the jury

59

apply the factors as if one incorporated another. It did not imply that factors one and two involved the same conduct, or that a finding of motive in factor two was equivalent to a finding of premeditation in factor three.

Moreover, although we find no constitutional error in the submission of the aggravating factors, assuming we were to conclude otherwise, any such error would not have affected the fairness of the proceedings in light of the district court's instructions to the jury. *See Jones*, 527 U.S. at 399-400. The court instructed the jurors not to simply count the number of aggravating factors in reference to the mitigators, but to "consider the weight and value of each." Thus, the jury would have known going into deliberations that, in reaching the verdict, it should make a qualitative assessment of the aggravating and mitigating evidence as a whole, rather than focusing on the number of factors on each side of the scale. Furthermore, the jury could not have possibly reached its verdict by simply comparing the total numbers of aggravating and mitigating factors given that it imposed death despite finding the existence of more mitigating than aggravating factors. Accordingly, we find unpersuasive Fell's challenge to the non-statutory aggravating factors presented by the government.

## IX. SUFFICIENCY OF THE INDICTMENT

Fell next complains that the government was required to charge the non-statutory aggravating factors in the indictment and that its failure to do so violates the Fifth Amendment's Indictment Clause.[27] Four courts of appeals have considered the issue of whether non-statutory

_____

[27] Fell contends that he raised this issue pretrial and it was denied, citing the district court's September 2002 order, 217 F. Supp. 2d at 483-84. It appears, however, that the precise issue the district court addressed in that order was whether the FDPA *precluded* the government from including aggravating factors in a grand jury indictment and was thus facially

60

aggravators must be submitted to a grand jury and included in an indictment, and all four have held that the FDPA does not expressly include this requirement. *See United States v. LeCroy*, 441 F.3d 914, 922 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 2096 (2007); *Purkey*, 428 F.3d at 749-50, *cert. denied*, 127 S. Ct. 433 (2006); *United States v. Bourgeois*, 423 F.3d 501, 507-08 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 2020 (2006); *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003), *cert. denied*, 543 U.S. 999 (2004).

Fell, relying on *Cunningham v. California*, 127 S. Ct. 856 (2007), *Ring v. Arizona*, and related Supreme Court precedents, urges us to reach a different conclusion. In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court emphasized that "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – – no matter how the State labels it – – must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83). Two years later, in *Ring*, the Supreme Court held that an aggravating factor rendering a defendant death-eligible "operate[s] as the functional equivalent of an element of a greater offense" and, therefore, must be found by a jury. *Id*. at 609 (internal quotation marks and citation omitted).

Although *Ring* said nothing regarding the Indictment Clause of the Fifth Amendment, some courts of appeals have interpreted the decision as applying with equal force at the indictment stage as at the penalty stage of a trial. Accordingly, several circuits, including our own, require the government to charge statutory aggravating factors under the FDPA in the

unconstitutional. *See id*. The district court held that the statute suffered from no such constitutional infirmity. *See id*; *Fell*, 360 F.3d at 138. All courts of appeals to have considered that argument have likewise rejected it. *See Sampson*, 486 F.3d at 21.

indictment. *See, e.g.*, *Quinones*, 313 F.3d at 53 n.1 (noting that, pursuant to *Ring v. Arizona*, "statutory aggravating factors . . . must now be alleged in the indictment and found by a jury in capital cases"); *see also Bourgeois*, 423 F.3d at 507; *Brown*, 441 F.3d at 1367 (collecting cases).

Here, the district court noted that the government "implicitly conceded" that the Fifth Amendment requires that statutory aggravating factors be charged in the indictment when, following *Ring*, it obtained a superseding indictment containing those factors. *Fell,* 217 F. Supp. 2d at 483-84. Although the court did not directly address whether the Fifth Amendment also requires that non-statutory aggravating factors be included in the indictment, it determined that the superceding indictment met the requirements of the Indictment Clause. *Id*. at 484. We agree.

Under FDPA § 3591(a)(2), "a defendant is not death eligible unless the sentencing jury . . . finds that the Government has proved beyond a reasonable doubt at least one of the statutory aggravating factors set forth at § 3592." *Jones*, 527 U.S. at 376-77. Once a defendant becomes "death eligible," the jury proceeds to make a "selection decision," in which it weighs all aggravating and mitigating factors to determine whether the defendant should be sentenced to death or life imprisonment. *Id*. at 377. The Supreme Court's distinction between eligibility and selection has led lower courts to conclude that only those factors which comprise death eligibility – – intent and statutory aggravation – – must be included in the indictment because those factors must be found before imposition of the maximum authorized penalty. *See, e.g.*, *Bourgeois*, 423 F.3d at 507; *cf. Ring*, 536 U.S. at 602. While we have never explicitly addressed the issue, we will adopt this conclusion for the purpose of our analysis here.

Fell avers, relying on *Cunningham*, that "a defendant is not exposed to the maximum penalty of death under the statute unless and until the jury has made findings for all non-statutory aggravators alleged." Specifically, he contends that findings of a culpable mental state and at least one statutory aggravating factor do not automatically expose the defendant to the death penalty because the jury still must consider whether the aggravating factor or factors "alone are *sufficient* to justify a sentence of death." 18 U.S.C. § 3593(e) (emphasis added). The *Cunningham* Court reiterated the bright-line rule stated in *Apprendi* that "[e]xcept for a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 127 S. Ct. at 868 (internal quotation marks omitted). Applying that rule, the Court concluded that California's Determinate Sentencing Law ("DSL") violated the Sixth Amendment insofar as it made a defendant's exposure to a sentence beyond the maximum contingent on the judge's finding, by a preponderance of the evidence, that an aggravating factor existed. *Id*. In Cunningham's case, the judge was *required* under the DSL to select a sentence of 12 years, "nothing less and nothing more, unless he found facts *allowing* the imposition of a sentence of 6 to 16 years." *Id*. (emphasis added). Accordingly, the relevant statutory maximum for Cunningham's offense was 12 years. The Court concluded that because the DSL authorized the judge to find facts that would expose the defendant to a sentence beyond that maximum, it violated the Sixth Amendment. *See id*. at 871. Notably, the *Cunningham* Court distinguished the DSL from the post-*Booker* advisory federal Sentencing Guidelines, under which judges remain free to "exercise

63

their discretion to select a specific sentence within a defined range." *Id*. at 870 (internal quotation marks omitted).

*Cunningham* does not compel the conclusion that Fell urges. Here, unlike in *Cunningham*, the jury, not a judge, found both the statutory and the non-statutory aggravating factors beyond a reasonable doubt. Regardless, the FDPA requires only that the jury sentencing Fell find mental culpability and at least one statutory aggravator, both charged in the superseding indictment, before finding him "eligible" for the death penalty. *See* 18 U.S.C. § 3593(e). Whether or not Fell *should* be sentenced to death was a calculation made by the jury based on a variety of statutory and non-statutory considerations. Accordingly, the factors that Fell's jury assessed when determining the permissibility of the death penalty in his case did not change the maximum sentence authorized under the statute. We find that the government's failure to include the non-statutory aggravating factors in the indictment did not violate the Fifth Amendment.

## X. CONSTITUTIONALITY OF THE FDPA

On appeal, Fell renews his claim that the FDPA violates the Fifth and Sixth Amendments by requiring in a single penalty phase, not governed by the Federal Rules of Evidence, the presentation of prejudicial evidence relevant to determining whether a defendant should be sentenced to death at the same time that the jury makes findings regarding the "gateway" factors allowing his statutory eligibility for the death penalty. This argument is necessarily predicated on the facial unconstitutionality of the FDPA, a premise that we rejected in an earlier opinion. *Fell*,

64

360 F.3d at 144.  In any event, the presentation of victim impact and character evidence to the jury during Fell's sentencing hearing caused no prejudice.

After *Fell I*, the district court rejected numerous other constitutional challenges to the FDPA.  *See Fell*, 372 F. Supp. 2d at 753.  Fell now renews his contention that the FDPA's bifurcated trial procedure violates the Fifth and Sixth Amendments.  He claims that the procedure allows for the introduction of potentially prejudicial sentencing evidence relating to character, prior uncharged conduct, and victim impact at the same time that the government is attempting to prove death-eligibility factors – – the elements of capital murder – – beyond a reasonable doubt.

When a jury reaches the penalty phase, it often decides death eligibility *after* it hears "selection" evidence relating to whether the death penalty is appropriate.  This approach may prejudice juror deliberations.  *Ring* and its progeny suggest that the FDPA's aggravating factors should be proven to a jury in the same manner as the other elements of the crime.  Writing for the majority in *Sattazahn v. Pennsylvania,* Justice Scalia explained that before *Ring*, "capital-sentencing proceedings were understood to be just that: *sentencing proceedings*."  537 U.S. 101, 110 (2003) (internal citation omitted).  In contrast, after *Ring*, factors that make a defendant eligible for a death sentence are treated as "elements" of a crime.  *Id.* at 111.

Fell contends that because these eligibility factors are considered elements of the crime, they should be subject to the same constitutional protections at trial, including the Sixth Amendment guarantee that the evidence against a defendant be proven beyond a reasonable doubt and be probative of an element of the crime.  *See Ring,* 536 U.S. at 609.  In contrast, the

65

victim impact evidence and character evidence constitutionally required for sentencing purposes can sometimes be unduly prejudicial, inflammatory, or irrelevant to guilt. Accordingly, "[m]uch of the information that is relevant to the [capital] sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question." *Gregg v. Georgia*, 428 U.S. 153, 195 (1976).

District courts have dealt with the potential problems presented by the FDPA in a variety of ways. For instance, a number of district courts have "trifurcated" capital proceedings by splitting the sentencing phase into two separate hearings: one for the eligibility phase and one for the selection phase. *See, e.g., United States v. Natson*, 444 F. Supp. 2d 1296, 1309 (M.D. Ga. 2006)*; United States v. Johnson*, 362 F. Supp. 2d 1043, 1110-11 (N.D. Iowa 2005); *United States v. Mayhew*, 380 F. Supp. 2d 936, 955-57 (S.D. Ohio 2005); *cf. United States v. Jordan*, 357 F. Supp. 2d 889, 903-04 (E.D. Va. 2005). A trifurcated proceeding allows a district court not only to avoid the admission of prejudicial evidence before the eligibility decision, *see Johnson*, 362 F. Supp. 2d at 1110 (describing trifurcation as a "cure" for the "potential unfair prejudice, confusion, and misdirection"), but also to delineate clearly between the applications of the Confrontation Clause in the eligibility and selection phases. Another response has been to preclude proof of non-statutory aggravating factors (*i.e.* evidence relevant only to "death selection") during the eligibility phase when that evidence threatened to undermine the presumption of innocence. *See, e.g., United States v. Gonzalez*, 2004 U.S. Dist. LEXIS 16907, at *5-9 (D. Conn. Aug. 17, 2004). The availability of such solutions under the FDPA allows

district courts to avoid unfair prejudice potentially resulting from the consideration of "death-selection" evidence before "death eligibility" has been determined.[28]

However, in the proceedings below, Fell did not request trifurcation or any other modification of the penalty procedure. Instead, he now claims that the FDPA is unconstitutional because it does not allow for trifurcation. We find no support for his novel theory. While the FDPA speaks of "a separate sentencing hearing" after which the jury makes both the eligibility decision and the selection decision, s*ee* 18 U.S.C. § 3593(b)-(e), the central point of that phrase is that the sentencing decision should be separated from the guilt phase – – not that the sentencing phase must necessarily take place during one uninterrupted hearing. *See generally Blake v. Carbone*, 489 F.3d 88, 100 (2d Cir. 2007). We find no error in the district court's implementation of the FDPA's sentencing procedures.

Regardless, Fell suffered no prejudice as a consequence of the manner in which the sentencing hearing was conducted. At sentencing, the government submitted three statutory aggravating factors, only one of which had to be found beyond a reasonable doubt to render Fell eligible for the death penalty: (1) "The death of Teresca King occurred during the commission of a kidnapping;" (2) "Donald Fell committed the offense in an especially heinous, cruel, or

---

[28] While the FDPA speaks of "a separate sentencing hearing" after which the jury makes both the eligibility decision and the selection decision, *see* 18 U.S.C. § 3593(b)-(e), the central point of that phrase is that the sentencing decision should be separated from the guilt phase – – not that the sentencing phase must necessarily take place during one uninterrupted hearing. *See generally Blake v. Carbone*, 489 F.3d 88, 100 (2d Cir. 2007) (noting our duty to "interpret statutes to avoid constitutional infirmities"). Although we would not go so far as to require trifurcation, we encourage district courts ruling on motions to trifurcate to consider carefully the ramifications of presenting victim impact evidence, or any evidence that would otherwise be inadmissible in the guilt phase of a criminal trial, to a jury that has not yet made findings concerning death eligibility.

67

depraved manner in that it involved serious physical abuse to Teresca King;" and (3) "Donald Fell intentionally killed or attempted to kill more than one person in a single criminal episode." Fell did not contest factors one or three during the sentencing phase; given his confessed participation in the kidnapping and murder of Ms. King, it would have been hard to do so. Presented with two *uncontested* factors, and needing to find only one to deem Fell "death eligible," the jury, in our view, was unlikely to have been swayed by the additional "death-selection" evidence – – mainly victim impact and character evidence – – when deliberating on whether Fell was "death eligible."  Accordingly, we conclude that Fell suffered no unfair prejudice resulting from the district court's implementation of the FDPA's sentencing procedures.

**CONCLUSION**

Chief Judge Sessions presided over this complicated and difficult trial with care, fairness, and an exemplary concern for the protection of Fell's rights.  The judgment of the District Court is affirmed.