07-1320-cr
United States v. Whitten

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 19th day of October, two thousand ten.

- - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,
          Appellee,

      - v.-

MICHAEL WHITTEN, PARIS BULLOCK, ANGEL
RODRIGUEZ, also known as Ice, JAMAL BROWN,     07-1320-cr
also known as Mal,
          Defendants,

RONELL WILSON, also known as Rated R,
           Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - -x

**ORDER**

Following disposition of this appeal on June 30, 2010, an active judge of the Court requested a poll on whether to rehear the case in banc. A poll having been conducted and there being no majority favoring in banc review, rehearing in banc is hereby **DENIED**.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

DEBRA ANN LIVINGSTON, *Circuit Judge*, with whom Judge CABRANES, Judge RAGGI, and Judge WESLEY join, dissenting:

The facts in this case are as straightforward as they are heartbreaking. Ronell Wilson, a violent gang member who favored the nickname "Rated R," shot and killed two undercover police officers at point blank range, murdering the first without warning, and the second even as the young officer, a father of three, pleaded for his life. Wilson did so because, in his own words, he "don't give a fuck about nobody." The bodies were unceremoniously searched and then dumped in the street. Two days after the wanton executions of Detectives Rodney Andrews and James Nemorin, Wilson was arrested and was found to be carrying rap lyrics he had authored – lyrics that celebrated the gun violence of "Rated R," appeared to brag of his recent murders, and, indeed, promised to continue committing such crimes until "I'm dead."[1]

A properly empaneled jury described by the district court as "among the most attentive and serious [it] had ever seen," heard and evaluated weeks of evidence before returning guilty verdicts on five capital counts. These jurors then absorbed another nine days of testimony at a penalty phase involving some forty witnesses and spanning nearly 1,800 transcript pages. On that record, the jury unanimously found that six aggravating factors – including killing for pecuniary gain, killing multiple people in a single incident, and killing a law enforcement officer in the course of duty – had been established beyond a reasonable doubt. The jurors also found that Wilson had established thirteen of the eighteen mitigating factors on which he relied, as well as finding a fourteenth – that Wilson "was possibly subject to peer pressure" – on their own. No juror concluded, however, that Wilson felt remorse for his crimes. Nor did any juror find that he had accepted responsibility for

---

[1] The facts above are drawn largely from the panel majority opinion in this case. *See United States v. Whitten*, 610 F.3d 168, 172-78 (2d Cir. 2010).

1

them, rejecting Wilson's claims to that effect made in an unsworn, uncrossed statement that he was permitted to read to the jury from the defense table. Having been instructed "to make a unique, individualized judgment about the appropriateness of imposing the death penalty" and that "no jury is ever required to impose the death penalty," the jury imposed *five* capital sentences on Wilson.

Despite the impeccable record developed below and the careful and conscientious work of the district court and the jury, a divided panel of this Court vacated these capital sentences, discerning Fifth and Sixth Amendment error in a handful of words buried in the government's summation. For the reasons amply set forth in my dissent, I believe the panel majority's Fifth and Sixth Amendment holdings were not only in error but that they are in profound tension, if not direct conflict, with the law of this Court, a sister Circuit, and the Supreme Court. *See United States v. Whitten*, 610 F.3d 168, 205-17 (2d Cir. 2010) (Livingston, J., concurring in part and dissenting in part).

The errors in the panel majority's analysis, moreover, have not only resulted in the unjustifiable rejection of sentences that were properly imposed for grave and merciless crimes. If left uncorrected, they threaten to needlessly complicate both the proper conduct of death penalty phase litigation in this Circuit and elsewhere, as well as the orderly adjudication of criminal liability more generally. I therefore respectfully dissent from the denial of rehearing *en banc*.

**I.**

The majority held that Wilson's Sixth Amendment right to stand trial was violated when the government argued – albeit fleetingly – in the penalty phase that Wilson's belated claim of "accept[ance] of responsibility," which he asserted as a mitigating factor, was not credible given that

2

it came only *after* the jury's guilty verdict.[2]  As more fully discussed in my principal dissent, this holding is in direct conflict with our prior holding in *United States v. Fell*, 531 F.3d 197, 218-21 (2d Cir. 2008), and the Seventh Circuit's decision in *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008), and is in considerable tension with the Supreme Court's analysis in *Portuondo v. Agard*, 529 U.S. 61, 67-68 (2000).  The majority simply disregarded *Portuondo* despite the fact that: (1) it is the *only* case in which the Supreme Court has addressed the question of whether a prosecutor's comment in summation on the exercise of a defendant's Sixth Amendment rights can be said to unconstitutionally penalize that exercise; and (2) the *Portuondo* analysis and outcome are directly contrary to the majority's.  Resolving the conflicts the majority opinion creates is, in and of itself, reason for the full Court's consideration of the Sixth Amendment issue.

In *Fell*, this Court found no error in the government's argument, during the penalty phase, that Fell's assertion of acceptance of responsibility as a mitigating factor was not credible in light of the fact that Fell had chosen to go to trial.  There, Fell introduced a stipulation that he had offered to plead guilty in exchange for a life sentence to support his claim that he had accepted responsibility for his crimes.  We found no error in the government's statement that, "Ladies and gentlemen, we had to try to convict him.  If [Fell] wanted to plead guilty, he could have pled guilty." *Fell*, 531 F.3d at 218.  Here, Wilson in effect *testified* – albeit without taking the stand – that he had accepted responsibility and felt remorse.  The government merely argued in summation that this testimony was not credible in light of its belated and self-serving timing:

---

[2]  I do not repeat here my earlier discussion of the many additional and powerful factors beyond the mere timing of Wilson's statement that supported the jury's unanimous conclusion, also echoed by the trial judge, that Wilson's allocution was not convincing and did not establish either his remorse or any acceptance of responsibility for his crimes.  *See Whitten*, 610 F.3d at 215-16 (Livingston, J., concurring in part and dissenting in part).

> He has an absolute right to go to trial, put the government to its burden of proof, to prove he committed these crimes, but he can't have it both ways. He can't do that, then say I accept responsibility. . . . And [say] ["]I'm sorry, only after you prove I did it.["] . . .
>
> The timing of his statement alone should tell you it's nothing more than a self-interested selfish man trying to save his own skin.

*Whitten*, 610 F.3d at 208 (Livingston, J., concurring in part and dissenting in part) (internal quotations omitted).

The conflict between the two cases is as apparent as it is confounding. In *Fell*, as here, the defendant asserted acceptance of responsibility as a mitigating factor. There, as here, the government responded to that acceptance of responsibility argument by noting that the defendant had chosen to go to trial. There, we affirmed, finding that where a defendant "endeavor[s] to . . . prove acceptance of responsibility as a mitigating factor," the government may "respon[d]" by putting that acceptance of responsibility "in context." *Fell,* 531 F.3d at 221. Here the majority, with no significant discussion of *Fell*, reversed, finding error in just such a response.

Leaving *Fell* aside, the majority's Sixth Amendment analysis also completely disregards the most significant authority available – the Supreme Court's decision in *Portuondo v. Agard*. There, the Supreme Court found *no* constitutional error, let alone reversible error, in a prosecutor's argument that the defendant's testimony might not be credible because "unlike all the other witnesses in this case the defendant has a benefit . . . he gets to sit here and listen to the testimony of all the other witnesses before he testifies." *Portuondo*, 529 U.S. at 64. Responding to the claim that this summation argument unlawfully burdened the defendant's Sixth Amendment rights to be present, to testify, and to confront the witnesses against him, the Court explained that it is "natural and irresistible for a jury, in evaluating the relative credibility of a defendant who testifies last, to

4

have in mind and weigh in the balance the fact that he heard the testimony of all those who preceded him." *Id*. at 67-68. The government's comment, the Court noted, merely "invite[d] the jury to do what the jury *is perfectly entitled to do*." *Id*. at 68 (emphasis added).

Here, as in *Portuondo* and as in *Fell*, the government was commenting on a fact that was "natural and irresistible" for the jury to "have in mind" in evaluating Wilson's assertion of acceptance of responsibility – namely, that it came only *after* a lengthy trial at which he maintained his innocence. Moreover, the government was simply "inviting the jury to [consider] what the jury [was] perfectly entitled to [consider]." Indeed, nowhere in its opinion did the majority contend – nor could it – that the jury was *not* entitled to consider that Wilson went to trial in evaluating the credibility of his belated profession of acceptance of responsibility and remorse. *See generally* U.S.S.G. § 3E1.1, Application note 2 (observing that an acceptance of responsibility adjustment is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse").[3] Nevertheless, without mention of *Portuondo*, the majority concluded that the government erred in commenting before the jury on a fact which (1) was obvious to it, and (2) it was entitled to consider.

Finally, the majority's analysis is in direct conflict with the conclusion of the Seventh Circuit in *Mikos*. There, the Seventh Circuit found no error in the government's use of the defendant's

---

[3] In its sole attempt to support its identification of Sixth Amendment error despite this Guidelines commentary, the majority relies on *United States v. Stratton*, 820 F.2d 562 (2d Cir. 1987). *See Whitten*,610 F.3d at 195-96 & n.19. In Part II of this dissent, I explain why *Stratton* is of limited, if any relevance, to the penalty phase of a death-eligible case and does not support the identification of Sixth Amendment error in this case, thus leaving the panel majority with *no* basis for ignoring the Guidelines' recognition that a defendant's decision to put the government to its burden of proof at trial is relevant to assessing his post-conviction claim of remorse.

5

allegedly remorseless demeanor in court (and thus, in essence, his decision to go to trial and remain silent there) to prove an *aggravating* factor during the penalty phase. As that court concluded, "[i]f it is proper to take confessions, guilty pleas, and vows to improve one's life into account when deciding whether a murderer should be put to death – and it is unquestionably proper for a judge or jury to do so – then it must also be proper for the prosecutor to remind the jury when none of these events has occurred." 539 F.3d at 718 (internal citation omitted). That conclusion, which is consistent with *Portuondo*, is fundamentally at odds with the majority's analysis in this case.

Thus, the majority opinion creates conflict with the law of this Court and with that of the Seventh Circuit, and is in considerable tension with binding Supreme Court precedent. This alone provides sufficient grounds for *en banc* consideration of the Sixth Amendment issue in this case. I am further troubled, however, by the fact that the panel majority's Sixth Amendment analysis leaves district and state trial courts, who are already grappling with the difficulties inherent in trying capital cases, at a total loss to determine whether and how, if at all, the government may respond to a defendant's post-conviction assertion of remorse and acceptance of responsibility, an occurrence that is certain to repeat itself in future death penalty litigation.

Briefly attempting to distinguish *Fell*, which it relegated to a footnote, the majority contended that the government's argument in that case was "responsive" because Fell put his "willingness to plead" at "issue" whereas Wilson "did not put in issue his decision to go to trial." *Whitten*, 610 F.3d at 196 n.20. The majority did not explain how or why Wilson's post-conviction assertion of acceptance of responsibility fell short of "put[ting] in issue his decision to go to trial," nor did it explain how Fell put his willingness to plead in issue when, in fact, the government *stipulated* that Fell was willing to plead guilty. Absent further clarification, the majority opinion

6

thus puts the government in the untenable position of having either to (1) remain completely silent regarding the obvious fact that the defendant's asserted "acceptance of responsibility" came only *after* he was convicted, or (2) respond in some fashion in the hope that this Court construes the argument offered as "responsive," *see id.*, rather than improper.

I cannot and do not agree that such an outcome is either compelled by the Sixth Amendment or desirable as a matter of practice. I would thus rehear this case so that the full Court might give appropriate guidance for district courts, prosecutors, and defense attorneys likely to face this issue with some frequency in the future.

## II.

The conflicts created by the majority's analysis and the uncertainty those conflicts engender, provide, on their own, sufficient grounds to render its Sixth Amendment holding appropriate for *en banc* review. Such review is further merited, however, so that the majority's improper invocation of this Court's decision in *United States v. Stratton*, 820 F.2d 562, 564 (2d Cir. 1987), might be corrected.

The majority's finding of Sixth Amendment error rested on the distinction we previously drew in *Stratton* between "increasing the severity of a sentence for a defendant's failure to cooperate," on the one hand, and "refusing to grant leniency" on that basis, on the other. In *Stratton* we found the latter permissible but deemed the former an unconstitutional penalty for the exercise of protected constitutional rights. *Id.* The majority here found that the government's argument in summation fell on the impermissible side of the *Stratton* divide, thus warranting reversal. As already noted in my panel dissent and as emphasized above, I find that conclusion both wrong and in conflict with *Fell*. Indeed, the majority makes no attempt to explain how the

7

government's argument in *Fell,* which was substantively identical to the one advanced here, fell on the proper side of *Stratton*.

The infirmities in the majority's analysis, however, rest on the resort to *Stratton* in the first place. In *Stratton*, which was not a death penalty case, it was "clear" from the record that the defendant's punishment had been *enhanced* as a direct result of his failure to cooperate, and thus his exercise of the right to remain silent. *Id*. Indeed, the district court "specifically stated that the sentences would run consecutively [rather than concurrently] because of Stratton's refusal to cooperate." *Id*. The *Stratton* court determined that the defendant's sentence there had been impermissibly enhanced, but distinguished the circumstance in which a judge declines to reduce a sentence or otherwise grant leniency to a defendant who has declined cooperation, which is, of course, a permitted and routine practice. *Id.*; *see also* U.S.S.G. § 3E1.1 (providing for a "decrease" in an offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense").

While I do not question the wisdom of its analysis in the context of judicially imposed sentencing, *Stratton* has limited, if any, relevance to the very different circumstance in which a *jury*, guided by death-penalty specific statutory and constitutional requirements, considers what sentence to impose. In making that decision, federal juries in the penalty phase consider various aggravating factors – at least one of which the government must establish beyond a reasonable doubt before a death sentence may be imposed – as well as any mitigating factors that a defendant chooses to advance, or even those that the jury identifies on its own. Moreover, the jury – and the jury alone – determines what weight, if any, to give to these factors. A capital jury, thus, could find one hundred aggravating factors and no mitigating factors and still refuse to impose a sentence of death.

8

Conversely, it could find one hundred mitigating factors and only the statutory minimum of one culpability and one aggravating factor, *see* 18 U.S.C. §§ 3591, 3593(e), and still return a death verdict.

As the majority would have it, any argument by the government against a mitigating factor constitutes an argument *supporting* death and thus for "increasing the severity" of the sentence for *Stratton* purposes. This simply isn't so. Mitigating factors, whether credited or discredited, can *never* form a basis for imposing death. Unproven or uncredited mitigating factors simply fall out of a jury's consideration. Accordingly, an argument against a mitigating factor, such as the argument advanced in this case, can never be a basis – let alone a "clear" basis – for "increasing the severity" of a sentence.

Here, the jury's determination that Wilson had not established the mitigating factors of acceptance of responsibility and remorse simply meant that he did not receive any favorable consideration for these factors in the jury's penalty deliberations. This determination by no means could or did establish the converse – i.e., that Wilson deserved a harsher sentence for failing to establish these mitigators, much less for exercising his right to stand trial. The law does not permit a capital jury to convert unproved mitigating factors into aggravating factors supporting a death sentence. Indeed, as the district court here specifically and correctly instructed the jury, it could consider *only* those aggravating factors cited by the government and identified by the court in its charge.

In sum, the majority's reliance on *Stratton* was misplaced as it failed to take into account the specific context and character of a penalty phase proceeding. From its misguided reliance on an inapposite precedent, the majority has sown further confusion into an already complex area of the

9

law.  For this reason, too, *en banc* review is appropriate.

## III.

I turn, next, to the alleged Fifth Amendment error in this case, an error that literally centered on three words in one sentence:  the government's assertion, in response to the defendant's unsworn, uncrossed "statement of remorse," that the jury should scrutinize that statement carefully, particularly given that "[t]he path for that witness stand *has never been* blocked for Mr. Wilson." *Whitten*, 610 F.3d at 198 (emphasis added).  Wilson, contending that this assertion unlawfully burdened his Fifth Amendment rights, requested a curative instruction which the district court denied and *which the majority concedes was not a correct statement of the law*.  *Id*. at 200. Nevertheless, based on its determination that the jury could have construed that single sentence, which was advanced *solely* in the government's discussion of Wilson's purported "statement of remorse," as a reference back to the *guilt* phase or to other aspects of the penalty phase, the majority found reversible error in the district court's failure to craft and to give (on its own and absent any direction from this Court) a so-called "variant" instruction.  I find that conclusion both wrong as a matter of law and potentially perilous to future practice in this Circuit.

To be clear, in finding a Fifth Amendment violation here, the majority had to announce at least four new principles of law: (1) that "an unsworn, uncrossed allocution constitutes a limited Fifth Amendment waiver that allows the prosecution to argue for an adverse inference from a defendant's failure to *testify* to that to which he has *allocuted*"; (2) that *Carter v. Kentucky* applies

10

to the sentencing phase of a criminal proceeding;[4] (3) that because the unsworn statement does constitute a limited waiver of the defendant's Fifth Amendment rights, a standard *Carter* instruction is not appropriate when such a statement is introduced; and (4) that a district court should instead give a "variant of the *Carter* instruction" which "allow[s] the jurors to consider [the defendant's] failure to testify *as to the subject of his allocution*, but that forbid[s] them from considering his failure to testify for any other purpose or as to any other part of the defense's case." *Id.* at 199-200 (emphasis in original).

There is no dispute that Wilson never requested such a charge. Accordingly, whatever the wisdom of these holdings as applied to *future* cases may be – and I express serious misgivings about at least the second and fourth – it was decidedly contrary to the law of this Court to find reversible error, whether under plain or harmless error review, in a district court's failure to take the defendant's request for a legally incorrect charge and instead craft – on its own and in the midst of trial – a "variant" instruction absent any clear guidance from this Court. *See United States v. Desinor*, 525 F.3d 193, 198 (2d Cir. 2008) (noting that "[a] conviction will not be reversed . . . unless the requested instruction was legally correct"); *see also United States v. Doyle*, 130 F.3d 523, 540 (2d Cir. 1997) (same); *United States v. Vasquez*, 82 F.3d 574, 577 (2d Cir. 1996) (same). "[A] requested charge 'must be accurate in every respect' before a trial judge is held in error for refusing

---

[4] *Carter* requires a district court to provide, on request, a prophylactic instruction that "no adverse inference" may be drawn from a defendant's decision not to testify at trial. *See Carter v. Kentucky*, 450 U.S. 288, 300 (1981). As noted in my dissent, the Supreme Court has never directly held that *Carter* applies at a sentencing phase where the Fifth Amendment interests of the defendant are different, *see generally Mitchell v. United States*, 526 U.S. 314 (1999), and there are strong reasons to believe that a *Carter* instruction may not be required, at least where, as here, the defendant has voluntarily effected a limited waiver of his Fifth Amendment right to remain silent at the penalty phase.

11

it." *United States v. Lam Lek Chong*, 544 F.2d 58, 68 (2d Cir. 1976) (citing *United States v. Leonard*, 524 F.2d 1076, 1084 (2d Cir. 1975) (Friendly, J.)). The panel majority cited no authority to the contrary, and I am aware of none.

Without question, therefore, our case law would benefit from further consideration not only of the groundbreaking Fifth Amendment steps the majority took – several taken with little discussion but significant future implications of their own – but also from reconsideration of a holding that a defect in jury instructions can mandate reversal even when the error is not plain and the defendant has failed to ask for a legally appropriate charge or to accurately identify the defect for the benefit of the district court. Because that latter issue, in particular, has broad implications that extend beyond the context of death penalty litigation, and because I fear the majority failed adequately to consider those implications in reaching its conclusions here, I cannot agree with the decision not to rehear this case and consider these issues more fully.

**IV.**

There is a final, troubling aspect to the manner in which the panel majority identified Fifth and Sixth Amendment error in this case. The majority simply disregarded the well-established principle that summation comments are not to be viewed in isolation but instead in the context of the proceeding as a whole. *See United States v. Thomas*, 377 F.3d 232, 244 (2d Cir. 2004) (collecting cases). It eschewed the Supreme Court's admonition that even "[i]nappropriate prosecutorial comments, standing alone, [do] not justify . . . revers[ing] a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985). Ignoring these principles, the majority instead parsed phrases and words, ultimately focusing on two isolated comments in the context of a two-week penalty phase and reversing without significant, let alone

12

convincing, analysis of why reversal was required. *Cf. Satterwhite v. Texas*, 486 U.S. 249, 256 (1988) ("The harmless error rule promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than the virtually inevitable presence of immaterial error." (internal quotations omitted)). The panel majority's approach suffers from serious defects that, if adopted by subsequent panels of this Court, have the potential seriously to undermine the adjudication of criminal proceedings – both capital and non-capital alike.

The deficiencies in the majority's approach are obvious. By focusing on isolated words and phrases, the panel majority considered summation comments with the sort of care and precision only hindsight affords – and thus in a manner no juror *ever would*. The panel majority's Fifth Amendment analysis, for example, turned on the Oxford English Dictionary definition of the word "never," which it argued supported its construction of the phrase "has never been." *Whitten*, 610 F.3d at 200 n.24. I certainly do not gainsay that dictionary definitions and rules of grammar are helpful to careful judicial consideration and construction of statutory language. But no juror listens to a summation with a dictionary in hand, pausing to parse the meaning of every word. To the contrary, the jury hears an argument as a whole and as commentary on a body of evidence it has heard and seen introduced over the course of, in this case, several weeks.

Consideration of the three words at issue in the panel majority's Fifth Amendment analysis – when evaluated in full context rather than isolation – amply illustrates the error in the majority's approach.[5] Whatever the validity of the majority's dictionary definition of the word "never" in the

---

[5] The challenged words read, in context, as follows:

> I want to talk to you a minute about the statement itself. You may have noticed that when he made that statement, Ronell Wilson wasn't sitting up there on the witness stand under oath, subject to cross examination. He chose to do it from

13

abstract, no jury hearing aloud an argument that began, "I want to talk to you a minute about the statement [of remorse] itself. You may have noticed that when he made that statement, Ronell Wilson wasn't sitting up there on the witness stand under oath, subject to cross-examination," would conclude that a subsequent comment that "[t]he path for that witness stand has never been blocked" was a comment on *anything* other than the statement of remorse, let alone an adverse comment on the defendant's failure to testify *at trial* or upon any other aspect of the sentencing proceeding. It blinks reality to argue otherwise.

Summations are not academic lectures "carefully constructed *in toto*" in advance. *Donnelley v. DeChristoforo*, 416 U.S. 637, 646-47 (1974). Instead, they are frequently extemporaneous arguments delivered in circumstances "inevitably charged with emotion." *United States v. Wexler*, 79 F.2d 526, 530 (2d Cir. 1935); *see also Donnelley*, 416 U.S. at 647 (observing that "improvisation" characteristic of summations "frequently results in syntax left imperfect and meaning less than crystal clear"). Recognizing this reality, the Supreme Court has instructed that a reviewing court "should not lightly infer that a prosecutor intends an ambiguous remark to have

---

there (indicating). The path for that witness stand *has never been* blocked for Mr. Wilson, [he] had that opportunity, too. He chose, like many other things in this case, to do it that way.

You may ask yourselves well, what more would we have if he took that stand, what would be the difference? Well, we might have been able to ask him when did you come up with this? How did you come up with it? Why did you come up with it? Why now? Why now of all times are you sorry? We might be able to test the credibility of the statement, the veracity of it. You might have information that could help you decide if you need to believe it. Ronell Wilson didn't want that. He wanted to say it from there, take my word for it now after all this, now I'm sorry.

*Whitten*, 610 F.3d at 212-13 (Livingston, J., concurring in part and dissenting in part) (internal quotations omitted).

14

its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelley*, 416 U.S. at 647. Rather, as noted, a court must view challenged summation comments in the context of the proceedings as a whole. *Thomas*, 377 F.3d at 244 (collecting cases).

The panel majority's identification of reversible error in two, isolated statements – to which it ascribed, in both instances and without justification, the *most* negative and *most* damaging implications a jury possibly could have drawn from those comments – is thus starkly at odds not only with the law as it has heretofore been applied by this Circuit, but with the reality of trial practice that has informed the development of that law. Because I view that outcome as not only wrong but perilous to future criminal practice in this and other circuits, I believe that rehearing is merited on this basis, as well.

## V.

Death is, indeed, different. But the imperative for "careful scrutiny . . . of any colorable claim of error," *Zant v. Stephens,* 462 U.S. 862, 885 (1983), still requires that there *be* error, and that this error be serious enough as to require reversal, before a jury's careful and conscientious work may be set aside. Accordingly, "not every imperfection . . . is sufficient, even in a capital case" to warrant reversal. *Id.* If this were not the law, Congress' determination that juries should answer the difficult life or death question posed in capital proceedings would be wholly undone by appellate judges. For as every trial lawyer knows, no courtroom proceeding is free from imperfection.

Ignoring this well-established principle, the majority needlessly overturned the thorough and careful work of the district court and the jury below, finding not just error, but reversible error, in roughly two sentences (one espousing an argument that we had previously deemed permissible),

15

uttered during the course of a two-week penalty phase. The cruel irony of the majority opinion, however, is that in elevating supposed imperfections to the level of reversible error, the majority breeds more confusion in already complex areas of law, thereby making it all the more difficult for future district and state trial courts to avoid the very sort of alleged infirmities that resulted in the reversal here. We owe them better. I am therefore compelled to dissent from our decision not to rehear this case and reconsider these issues *en banc*.